# EXHIBIT 7

*To Be Argued By*:
Jerry H. Goldfeder
(Time Requested: 15 minutes)

# New York Supreme Court

# Appellate Division—Second Department

App. Div. Docket No. 2016-6927

In the Matter of
PHILIP M. PIDOT,

*Petitioner-Appellant*,

*-against-*

DOMINIC J. MACEDO, ROBERT DONNO, MARK S. SAUVIGNE, MARLENE LOBATO, and THE NEW YORK STATE BOARD OF ELECTIONS,

*Respondents-Respondents*.

------------------------------------------------------------------------

In the Matter of
DOMINIC J. MACEDO, ROBERT DONNO, MARK S. SAUVIGNE, MARLENE LOBATO,

*Petitioners-Respondents*,

*-against-*

PHILIP M. PIDOT, Candidate

*Respondent-Appellant*,

*-and-*

GREGORY PETERSON, PETER KOSINSKI, DOUGLAS KELLNER, and ANDREW SPANO, Commissioners Constituting the New York State Board of Elections,

*Respondents-Respondents*.

## BRIEF OF PETITIONER-APPELLANT PHILIP PIDOT

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400
*Counsel for Petitioner-Appellant Philip Pidot*

Of Counsel:
Jerry H. Goldfeder
Kerry T. Cooperman
Nathaniel H. Benfield

**NASSAU COUNTY CLERK'S
INDEX NO. 3448-2016 / 3124-2016**

*Printed on Recycled Paper*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................. iii

QUESTION PRESENTED .................................................................1

PRELIMINARY STATEMENT.............................................................2

STATEMENT OF RELEVANT FACTS .................................................5

    A.    Pidot Timely Filed the Requisite Number of Petition Signatures to Appear on the Ballot for the Republican Primary Election .............5

    B.    Senator Martins Challenged Pidot's Designating Petition in a Bid to Block Pidot's Name from the Ballot ........................................6

    C.    The BOE Ruled That Pidot's Designating Petition Was Invalid, and Pidot Commenced a Proceeding in State Supreme Court Challenging That Ruling ........................................................6

    D.    The Trial Court Erroneously Dismissed Pidot's Validating Proceeding on Procedural Grounds, Pidot Moved to Vacate That Decision, and Pidot Appeals to This Court..................................7

    E.    The Supreme Court Determined That the BOE Erred and That Pidot Had Sufficient Signatures to Qualify for Placement on the Republican Primary Election Ballot....................................................8

ARGUMENT ................................................................. 10

    POINT I    PIDOT'S EXCLUSION FROM THE JUNE 28, 2016 PRIMARY ELECTION BALLOT REQUIRES A RESCHEDULED PRIMARY ELECTION ................................. 12

    A.    Irregularities in the Primary Election Require a Rescheduled Primary Election Under Election Law § 16-102(3) .......................... 12

    B.    Pidot's Exclusion From the Ballot Requires a Rescheduled Primary Election Under Election Law § 16-100 ............................... 15

    POINT II    THERE IS NO BARRIER TO THIS COURT'S ORDERING A NEW PRIMARY ELECTION ........................... 17

    A.    Judge Sharpe's Order Does Not Preclude a New Primary Election................................................................. 17

    B.    The MOVE Act Does Not Preclude a New Primary Election ........... 20

C. The BOE's Administrative Burdens Do Not Outweigh the Need for a New Primary Election ................................................... 23

CONCLUSION ....................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>Boyland v. Bd. of Elections of City of New York</u>,
  90 A.D.2d 523 (2d Dep't 1982) ......................................................................... 12

<u>In re Branagan</u>,
  19 A.D.2d 337 (4th Dep't 1963) ....................................................................... 13

<u>Breitenbach v. Heffernan</u>,
  245 A.D. 374, <u>aff'd</u>, 268 N.Y. 718 (1935) ................................................. 16, 22

<u>Brown v. Ulster Cty. Bd. of Elections</u>,
  48 N.Y.2d 614 (1979) ...................................................................................... 16

<u>Busbee v. Smith</u>,
  459 U.S. 1166 (1983) ....................................................................................... 19

<u>Corrigan v. Bd. of Elections of Suffolk Cty.</u>,
  38 A.D.2d 825, <u>aff'd,</u> 30 N.Y.2d 603 (1972) ................................................... 12

<u>Crawford v. Cohen</u>,
  291 N.Y. 98 (1943) .......................................................................................... 12

<u>Delgado v. Sunderland</u>,
  97 N.Y.2d 420 (2002) ...................................................................................... 12

<u>Doe v. Walker</u>,
  746 F. Supp. 2d 667 (D. Md. 2010) ................................................................. 22

<u>Herron v. Koch</u>,
  523 F. Supp. 167 (E.D.N.Y. 1981) .................................................................. 19

<u>Hunter v. Orange Cty. Bd. of Elections</u>,
  11 N.Y.3d 813 (2008) ................................................................................. 16, 17

<u>Indep. Party State Comm. v. New York State Bd. of Elections</u>,
  297 A.D.2d 459 (3d Dep't 2002) ..................................................................... 18

Ippolito v. Power,
    22 N.Y.2d 594 (1968) .................................................................. 12, 14

Komanoff v. Dodd,
    114 A.D.2d 429 (2d Dep't 1985) ......................................................... 13

Korniczky v. Sunderland,
    175 Misc. 2d 912 (Sup. Ct. Westchester Cty. 1998) ......................................... 15

Lisa v. Bd. of Elections,
    54 A.D.2d 746 (2d Dep't 1976), aff'd sub nom., 40 N.Y.2d 911
    (1976) ............................................................................. 10

McGuinness v. De Sapio,
    9 A.D.2d 65 (1st Dep't 1959) ..................................................... 11, 12

Merola v. Power,
    60 Misc. 2d 245 (Sup. Ct. Bronx Cnty.), aff'd, 33 A.D.2d 514 (1st
    Dep't 1969) ...................................................................... 13

Mondello v. Nassau Cty. Bd. of Elections,
    6 A.D.3d 18 (2d Dep't 2004) ...................................................... 12

Piazza v. Rockland Cty. Bd. of Elections,
    17 Misc. 3d 1111(A) (Sup. Ct. Rockland Cnty. 2007) ............................... 11, 13

Pidot et al. v. Macedo et al.,
    No. 2016-05794, 2016 WL 3355183 (2d Dep't 2016) ........................................8

Pidot et al. v. Macedo et al.,
    No. 3448/2016 (Sup. Ct. Nassau Cty., June 7, 2016) ........................................7

Public Citizen, Inc. v. Miller,
    992 F.2d 1548 (11th Cir. 1993) ...................................................... 19

Matter of Rosmarin,
    107 A.D.2d 689 (2d Dep't 1985) ...................................................... 18

Ross v. Scaringe,
    96 A.D.2d 1109 (3d Dep't 1983) ..................................................... 22

Smith v. Bd. of Elections of City of New York,
    176 A.D.2d 841 (2d Dep't 1991) ...................................................... 13

United States of America v. The State of Vermont,
    Index No. 5:12-cv-236 (D. Vt.) ........................................................ 21

United States v. Cunningham,
    No. CIV. A. 3:08CV709, 2009 WL 3350028 (E.D. Va. Oct. 15,
    2009) ................................................................................................ 22

United States v. The State of New York,
    No. 1:10-cv-1214, 2012 U.S. Dist. LEXIS 16126 (N.D.N.Y. Feb.
    9, 2012) ............................................................................................ 17

Weprin v. Larkin,
    40 A.D.2d 606 (2d Dep't 1972) ....................................................... 13

Winn v. Washington Cty. Bd. of Elections,
    196 A.D.2d 674 (3d Dep't 1993) ................................................. 15, 16

**Statutes**

52 U.S.C. § 20302 ("Move Act") ................................................ *passim*

52 U.S.C. § 20302(a)(8)(A) ................................................................ 20

52 U.S.C. §§ 20302(g)(1), (g)(2)(B)(ii), (g)(3)(B) ......................... 21, 23

N.Y. Election Law, Art. 16 .................................................. 2, 6, 10, 17

N.Y. Election Law § 330(2) ........................................................... 11, 12

Voting Rights Act § 5 ......................................................................... 19

N.Y. Elec. Law § 6-136 ........................................................................5

N.Y. Elec. Law § 16-100 .......................................................... *passim*

N.Y. Elec. Law § 16-102(3) ..................................................... *passim*

**Other Authorities**

*Albany Must Pick One Date for State and Federal Primaries*, N.Y.
    DAILY NEWS, December 16, 2011, *available at*
    http://www.nydailynews.com/opinion/albany-pick-date-state-
    federal-primaries-article-1.992285 ......................................................5

New York State Board of Elections, Enrollment by Congressional
    District, as of April 1, 2016,
    http://www.elections.ny.gov/NYSBOE/enrollment/congress/congr
    ess_apr16.pdf ..................................................................................................4

*Primary Elections Are Cancelled*, N.Y. LAW JOURNAL, September 12,
    2001, a3, col. 2 .................................................................................... 19

## QUESTION PRESENTED

Did the Trial Court err in failing to order a new Republican Primary Election for New York's Third Congressional District where it granted Appellant Pidot's validating petition to restore his name to the June 28, 2016 Primary Election ballot but found it "impossible" to do so?

Yes.  The Trial Court's decision was erroneous.

## PRELIMINARY STATEMENT

This is a case of apparent first impression.  Appellant Philip Pidot timely submitted a designating petition to run in the June 28, 2016 Republican Party primary election for United States Congress from the Third Congressional District in New York (the "Primary Election"); the New York State Board of Elections (the "BOE") erroneously invalidated his petition; Pidot exercised his rights in court under Article 16 of the New York State Election Law (the "Election Law"); and, after a full forty-eight days, the Supreme Court finally validated his candidacy, ruling that Pidot was entitled to a place on the June 28, 2016 ballot (the "Trial Court Order").

However, in that the Trial Court Order was issued five days before the scheduled Primary Election, the Court also ruled that it was "impossible" to actually place Pidot's name on the ballot.  Excluding Pidot from the ballot left just one other candidate, State Senator Jack Martins; under state law, where there is only one candidate for a party's nomination, that candidate is automatically selected, without any votes being cast.

In a word, Pidot won on the law, but lost on the point that mattered most—a place on the June 28th ballot.  Pidot requested that the Supreme Court set a new date for the Primary Election to allow him to contest the nomination.  The Supreme Court had the authority—even the obligation—to do so under the facts and

circumstances of this case.  The Court refused, without as much as giving a reason.  This Court should exercise its full jurisdiction to reverse or modify the Trial Court Order and do so.

Respondents raised two reasons against this application.  First, they argued that the state courts have no authority to order a new primary.  This is false.  Second, they argued that the federal Uniformed and Overseas Citizens Absentee Voting Act, as amended in 2009 by the Military and Overseas Voter Empowerment Act, 52 U.S.C. § 20302 (the "MOVE Act"), which requires that military and other overseas voters have their absentee ballots mailed to them 45 days before an election, also precluded the court from doing so.  This, too, is wrong.

Courts have held that, when there are irregularities in primary elections, the explicit provisions of the Election Law permit the state courts to order a new primary election.  Fortunately, this does not occur frequently, but courts have done so where appropriate.  Here, the irregularity is somewhat different from those in previous cases, but, frankly, there could be no greater irregularity than an alleged "impossibility" caused by extensive litigation that prevented the Primary Election from taking place.  What could be more irregular than preventing a candidate who had successfully exercised his litigation rights under the Election Law to secure his place on the ballot from actually being on the ballot?  What could be more

-3-

irregular than denying 152,879 Republican enrollees[1] in the Third Congressional District from voting for one of two eligible candidates?

The MOVE Act, enacted to make certain that military and overseas voters have sufficient time to cast their ballots, should not be used as an excuse to prevent voting. Indeed, even at this time, should this Court modify or reverse the Supreme Court and order a new primary election, it has two choices: (1) to set a date sufficiently in advance so that the MOVE Act may be complied with in the primary election as well as in the November general election, or, alternatively, (2) to order the BOE to seek a waiver of the MOVE Act. When passing the Act, the United States Congress contemplated waivers from the 45-day requirement when litigation frustrated the forty-five day mailing period. The law explicitly requires the BOE to seek such a waiver. This Court, in conjunction with ordering a new primary election, has the power to order the BOE to do so. Mailing military and overseas ballots to 229 eligible overseas voters thirty days in advance, for example, instead of forty-five days, is a far superior solution to denying 152,879 total eligible voters in the Third Congressional District from voting at all.

In sum, by directing a new primary, this Court is presented with the opportunity to correct a gross inequity.

---

[1] See New York State Board of Elections, Enrollment by Congressional District, as of April 1, 2016, http://www.elections.ny.gov/NYSBOE/enrollment/congress/congress_apr16.pdf. Of these 152,879 enrolled Republicans, 103 military personnel and 126 other eligible overseas voters requested absentee ballots. It is these 229 overseas voters who are impacted by the MOVE Act.

## STATEMENT OF RELEVANT FACTS

Appellant Philip Pidot is an enrolled Republican who is eligible to vote in the 2016 Republican Primary Election for the public office of Representative in Congress from New York's Third Congressional District.   He was also a duly validated candidate for the Primary Election ballot.  New York State Senator Jack Martins was the only other duly validated candidate for this Congressional seat.

### A.   Pidot Timely Filed the Requisite Number of Petition Signatures to Appear on the Ballot for the Republican Primary Election

On April 14, 2016, Pidot timely filed his designating petition with the BOE containing the signatures of 2,191 voters who were enrolled in the Republican Party and resided in the Third Congressional District in New York, more than the 1,250 signatures required to qualify for the Republican Primary Election ballot under the Election Law.  See N.Y. Elec. Law § 6-136; Trial Court Order, at 2.

Pidot filed his designating petition pursuant to an election calendar set by an Order, dated October 29, 2015, of the Honorable Gary L. Sharpe of the District Court for the Northern District of New York ("Judge Sharpe's Order").[2]   Under

---

[2] Judge Sharpe set the federal calendar because the state legislature failed to come to an agreement: the Democrats wanted a June federal primary and the Republicans wanted a late August federal primary.  See *Albany Must Pick One Date for State and Federal Primaries*, N.Y. DAILY NEWS, December 16, 2011, *available at* http://www.nydailynews.com/opinion/albany-pick-date-state-federal-primaries-article-1.992285.  The federal primary could not be held on the same day as the state legislature primary—September 13, 2016—because the BOE alleged that New York would be out of compliance with the MOVE Act if the congressional primary were held on that date.

that Order, candidates were required to submit their designating petitions during the period from April 11, 2016 through April 14, 2016.  The Republican Primary Election was scheduled for June 28, 2016.  And the general election is scheduled for November 8, 2016.

### B.   Senator Martins Challenged Pidot's Designating Petition in a Bid to Block Pidot's Name from the Ballot

Exercising their rights under the Election Law, on April 25 and April 26, 2016, Senator Martins' surrogates (the "Martins Objectors") filed objections to Pidot's designating petition with the BOE.  Also pursuant to the Election Law, on April 27, 2016, they commenced an anticipatory proceeding in Nassau County Supreme Court to invalidate Pidot's designating petition.

### C.   The BOE Ruled That Pidot's Designating Petition Was Invalid, and Pidot Commenced a Proceeding in State Supreme Court Challenging That Ruling

On May 4, 2016, the BOE determined that, of the 2,191 petition signatures submitted by Pidot, only 1,234 were valid, leaving him sixteen signatures short of the qualifying threshold.  Thus, the BOE deemed Pidot's petition invalid.  See Trial Court Order, at 2.

On May 6, 2016, Pidot exercised his rights under Article 16 of the Election Law and commenced a validating petition by Order to Show Cause in Nassau County Supreme Court to contest the BOE's erroneous determination and to

validate his designating petition.  The Honorable Michael Melkonian signed the Order to Show Cause, setting the return date for the hearing on Pidot's validating petition for May 11, 2016. Id. at 1.

**D.    The Trial Court Erroneously Dismissed Pidot's Validating Proceeding on Procedural Grounds, Pidot Moved to Vacate That Decision, and Pidot Appeals to This Court**

On May 11, 2016, the Honorable Thomas Adams of Nassau County Supreme Court held a preliminary hearing on Pidot's validating proceeding. See Pidot et al. v. Macedo et al., No. 3448/2016 (Sup. Ct. Nassau Cty., June 7, 2016) (Adams, J.).   The Martins Objectors moved to dismiss Pidot's validating proceeding for failure to properly effect service, and Justice Adams granted the motion from the bench. Id.

Two days later, and before a written order was entered, Pidot provided Justice Adams with Appellate Division, Second Department, authority, unequivocally establishing that His Honor should have denied the Martin Objectors' motion to dismiss.  On May 18, 2016, in the absence of an amended order from Justice Adams, Pidot moved to vacate Justice Adams' ruling.  Twenty days later, on June 7, 2016, Justice Adams issued a written decision denying Pidot's motion to vacate. Id.

Pidot immediately served a Notice of Appeal of Justice Adams' dismissal of the validating petition on procedural grounds.  On June 17, 2016, this Court heard

-7-

oral argument and, on the very same day, issued a Decision and Order unanimously reversing Justice Adams' decision, remanding the matter to the Supreme Court for "a determination of the petition on the merits forthwith." Pidot et al. v. Macedo et al., No. 2016-05794, 2016 WL 3355183 (2d Dep't 2016).

**E.    The Supreme Court Determined That the BOE Erred and That Pidot Had Sufficient Signatures to Qualify for Placement on the Republican Primary Election Ballot**

Pidot immediately notified the Nassau County Clerk of the Appellate Division's ruling. The case was docketed for the morning of June 20, 2016 before the Honorable Arthur M. Diamond, but the Court adjourned the matter to June 21, 2016 as it had not yet received this Court's remittitur.

Upon receipt of the remittitur, Justice Diamond held a hearing, from June 21 through June 23, on the validity of Pidot's designating petition. Trial Court Order, at 2. At the outset of the hearing, the Martins Objectors served a motion to dismiss Pidot's designating petition on the basis that, even if Pidot's designating petition were deemed to have a sufficient number of signatures, it would be "impossible" for the local Boards of Elections to place him on the ballot in time for the June 28, 2016 Primary Election—on logistical grounds, and because of the MOVE Act. See Ciampoli Affirmation in Support of Motion to Dismiss, dated June 20, 2016 ("Ciampoli Aff."), par. 61-2. Justice Diamond held that motion in abeyance until after the hearing on the petition signatures. Trial Court Order, at 2.

On the afternoon of June 23, 2016, Justice Diamond ruled from the bench that Pidot had 1,261 valid signatures, eleven more than required to qualify him for the Republican Primary Election ballot.

Justice Diamond then heard argument on the Martin Objectors' motion to dismiss Pidot's validating proceeding on the ground that it would be logistically impossible to place him on the June 28th Primary Election ballot for two main reasons:

1.   the MOVE Act required the BOE to transmit ballots to military and other oversees personnel not less than 45 days before the Primary Election, and, by the time of the hearing, the Primary Election was only five days away; and

2.   the time needed to prepare for the Primary Election in compliance with the Election Law, including publishing notice of the election and programming voting machines, rendered it impossible for election officials to add Pidot's name to the ballot at that late date.

See Trial Tr. 400:10-13;[3] Ciampoli Aff., at 14, 16.

Pidot argued, *inter alia*, that an alternate remedy could be fashioned: the rescheduling of the primary election at a later date.   Trial Court Order, at 2. Specifically, Pidot argued that, because the general election was still over four months away, the Supreme Court could and should reschedule the primary election to a date that would allow full compliance with the MOVE Act's 45-day rule. Trial Tr. 393:8-21.

---

[3] A true and correct copy of the transcript of the June 21-23, 2016 trial has been submitted to this Court.  The excerpt relating to Respondents' motion that the Republican Party Primary Election should not be held is annexed hereto.

On Friday, June 24, 2016, Supreme Court issued the Trial Court Order denying the Martin Objectors' motion to dismiss, but nevertheless deemed it impossible to add Pidot to the ballot for the June 28th Primary Election. See Trial Court Order, at 3. The Court did not order a rescheduled primary election, but gave no reason. Id. at 3.[4]

The instant appeal was noticed on July 7, 2016.

## ARGUMENT

New York courts have broad authority to determine questions of law and fact, and to accord injunctive and other relief, under the state Election Law. See N.Y. Elec. Law § 16-100 (providing that  such authority "shall be construed liberally").  The legislature conferred expansive decision-making and remedial powers on state courts in election matters to empower them to "compel the conduct of fair primary elections." Lisa v. Bd. of Elections, 54 A.D.2d 746, 746 (2d Dep't 1976), aff'd sub nom., 40 N.Y.2d 911 (1976) (Court has jurisdiction to do so in the event of fraud or irregularities in the voting process).  Thus, courts have not

---

[4] On the following business day, Monday, June 27, 2016, Pidot commenced an action in federal court seeking similar relief.  A few days later, he retained the undersigned, who, after reviewing the voluminous file and analyzing the facts and the law, voluntarily withdrew the federal action. The Court is advised that several disenfranchised voters from the Third Congressional District, along with Pidot, anticipate filing their own complaint in federal court.  Such an action would seek to vindicate their constitutional and § 1983 rights not at issue in the instant case, which, of course, was brought by Pidot under Article 16 of the Election Law.

The Court is further advised that if this Court reverses or modifies the Supreme Court and orders a new primary election, the anticipated federal court action would be mooted and voluntarily withdrawn.

-10-

hesitated to intercede in election matters—including to direct the holding of new primary elections—when needed to ensure "fairness and [the] protection of the voters' franchise." Piazza v. Rockland Cty. Bd. of Elections, 17 Misc. 3d 1111(A), *2 (Sup. Ct. Rockland Cnty. 2007) (directions by Board of Elections imparted little or wrong information to voters, making it impossible to determine who won; new primary election ordered).

Amplifying the general authority of state courts in this context, the legislature specifically empowered courts to "direct . . . the holding of a new primary election . . . where [they] find[] there has been such fraud or irregularity as to render impossible a determination as to who rightfully was nominated or elected." N.Y. Elec. Law § 16-102(3). The Appellate Division has repeatedly relied on this provision, and its predecessor (Election Law § 330(2)), to "cancel" unlawful primary elections upon a showing of any irregularity that "could have" affected the outcome and made it "impossible to determine one way or the other who rightfully [was] elected." McGuinness v. De Sapio, 9 A.D.2d 65, 71 (1st Dep't 1959) (finding that allegedly aggrieved candidates had waived their right).

## POINT I
## PIDOT'S EXCLUSION FROM THE JUNE 28, 2016 PRIMARY ELECTION BALLOT REQUIRES A RESCHEDULED PRIMARY ELECTION

### A.   Irregularities in the Primary Election Require a Rescheduled Primary Election Under Election Law § 16-102(3)

Election Law § 16-102(3) was designed for this very situation—where an "irregularity" in the primary election process "render[ed it] impossible [to] determin[e] . . . who rightfully was nominated" and thus merited a "new election" to ensure an accurate outcome.[5]  See N.Y.S. Elec. Law § 16-102(3); McGuinness, 9 A.D.2d at 71 (emphasizing that the "possibility . . . of a false [election] result . . . is enough" to justify a rescheduled election).  New York courts have frequently relied on this provision (and its predecessor, Election Law § 330(2)) in determining that a wide range of primary election-related irregularities impacting voters' franchise warranted a new primary election.  For example:

- The Court of Appeals directed a new vote to be held under the predecessor to Election Law § 16-102(3) upon finding that a failure to adequately "accommodate[]" certain voters at a balloting venue rendered it "impossible" to determine the outcome, Crawford v. Cohen, 291 N.Y. 98, 102-03 (1943);

---

[5]  Respondents' reliance on cases involving a general election—rather than, as here, a new primary election under Election Law § 16-102(3)—is wholly misplaced.  See Corrigan v. Bd. of Elections of Suffolk Cty., 38 A.D.2d 825, aff'd, 30 N.Y.2d 603 (1972) (finding that the court lacked authority to order a new "general election" and explaining that the predecessor to Election Law § 16-102(3) only "gives the court summary power to set aside a *primary* election and order a new one . . . it does not give the court summary power to do either of those things with respect to a *general* election") (emphasis in original); Delgado v. Sunderland, 97 N.Y.2d 420, 423 (2002) (same); Mondello v. Nassau Cty. Bd. of Elections, 6 A.D.3d 18, 19 (2d Dep't 2004) (involving the counting of absentee ballots in a general election contest).

-12-

- The Court of Appeals affirmed the ordering of a new primary election where just "a small portion of . . . suspect votes" in a primary could have "changed . . . the outcome," Ippolito v. Power, 22 N.Y.2d 594, 597 (1968);

- The Appellate Division, Second Department, determined that "the substantial difference between the number of irregularities and the plurality" in the voting result justified "ordering a new election," Boyland v. Bd. of Elections of City of New York, 90 A.D.2d 523, 523 (2d Dep't 1982);

- The Appellate Division, Second Department, affirmed that, "due to the narrow margin of victory" in a primary election (32 votes), the fact that 98 ballots were found to be invalid was a "sufficient irregularit[y] in the primary as to render impossible a determination as to who rightfully was nominated," thus warranting a new primary under Election Law §16-102(3), Komanoff v. Dodd, 114 A.D.2d 429, 430 (2d Dep't 1985);

- The Appellate Division, Fourth Department, found an irregularity warranting a new primary election where, in the original primary election, voting machines had counted and tabulated 47 more votes than had actually been cast. In re Branagan, 19 A.D.2d 337, 338 (4th Dep't 1963);

- The Supreme Court, Rockland County, directed a new primary election "at the earliest possible time" under Election Law § 16-102(3) upon finding "irregularities" such as "incorrect, little or wrong information imparted to [voters]," Piazza, 17 Misc. 3d 1111(A); and

- The Supreme Court, Bronx County, "directed . . . the Board of Elections . . . to hold a new Primary Election for the office of City Councilman . . . not later than the 23rd day of September, 1969" after finding various irregularities, Merola v. Power, 60 Misc. 2d 245, 248 (Sup. Ct. Bronx Cnty.), aff'd, 33 A.D.2d 514 (1st Dep't 1969).

These and other decisions underscore the fact that many types of primary election-related irregularities that create the possibility of a false or questionable result may justify a new election. See Smith v. Bd. of Elections of City of New York, 176 A.D.2d 841, 841 (2d Dep't 1991) (explaining that the "number" or "nature" of irregularities may justify a "new primary election"); Weprin v. Larkin, 40 A.D.2d

606, 607 (2d Dep't 1972) (suggesting that "many . . . factors" may contribute to such a determination).

Contrary to Respondents' false assertion, "fraud" is not the only yardstick that requires a new primary election. The Court of Appeals has explained that:

> While it is troubling to require a new election for irregularities without evidence of fraud or other intentional misconduct, ignoring such irregularities would undoubtedly create the likelihood that skillfully manipulated 'irregularities' would be used to mask corrupt practices. . . . And the statute is explicit in directing that irregularities, as well as fraud, may justify the direction of a new election.

Ippolito, 22 N.Y.2d at 597.

Equally false is Respondents' assertion that Election Law § 16-102(3) applies only *after* an irregular primary has been completed. See Trial Tr. 396:22 – 397:3. There is no authority for this pinched interpretation of the statute. And there is no authority precluding a Court from invoking this provision to reschedule a primary under the extraordinary facts and circumstances found here. Id. at 393:8-21, 400:14 – 401:5. Indeed, Election Law § 16-100 mandates a "liberal[]" construction of courts' powers in this context, not the narrow construction proffered by Respondents. Thus, it is undisputed that this Court has the power to order a new primary election under Election Law § 16-102(3).

After all, what could be more "irregular" than to hold a "primary" where an eligible candidate is not on the ballot and not one of 152,879 eligible voters can cast a ballot?

Election Law § 16-102(3) was designed to prevent or rectify irregular circumstances. Even if the instant situation is apparently novel, it would be absurd to not deem it sufficiently irregular for purposes of this statute. The Court should exercise its authority thereunder to order a new primary election forthwith.

### B. Pidot's Exclusion From the Ballot Requires a Rescheduled Primary Election Under Election Law § 16-100

Even if a rescheduled Republican primary election is not permitted under Election Law § 16-102(3)—which it is— a new primary is permitted under § 16-100. This provision has been construed to independently confer on courts the broad authority to "remedy . . . error[s] in such a fashion as to permit the voters . . . an opportunity to exercise a choice in the scheduled election." Korniczky v. Sunderland, 175 Misc. 2d 912, 920 (Sup. Ct. Westchester Cty. 1998). A court's invocation of its powers under Election Law § 16-100 is "especially appropriate where, as here, there has been a clear intention to nominate some person to run for the office . . . ." Id.

Under Election Law § 16-100, courts have repeatedly granted a candidate's request "to give enrolled voters of a political party an opportunity to vote" for him

or her.  For example, courts have directed Boards of Elections to afford voters an Opportunity to Ballot for candidates who have failed to obtain the requisite number of petition signatures.  Indeed, the Appellate Division and Court of Appeals have not hesitated to reverse lower courts that failed to grant such relief.  See, e.g., Winn v. Washington Cty. Bd. of Elections, 196 A.D.2d 674, 674 (3d Dep't 1993) (reversing the lower court and, "invoking [its] power under Election Law § 16-100," ordering that, even though the candidate's designating petition was invalid, the Board of Election was required to "provide registered voters of the Democratic Party with an opportunity to ballot" for such candidate); Brown v. Ulster Cty. Bd. of Elections, 48 N.Y.2d 614, 616 (1979) (reversing the Third Department and reinstating a lower court determination dismissing a validating petition but nevertheless directing the subject Board of Elections to provide enrolled voters with an opportunity to vote).  Thus, the candidates in Winn and Brown, whose petitions were invalidated, nevertheless were granted by the courts the opportunity to contest a primary nomination.

In the instant case, Pidot is *much more clearly entitled* to relief under Election Law § 16-100 than the candidates were in Winn and Brown.  Unlike those candidates, whose designating petitions were technically invalid, Pidot duly secured a place on the Republican Primary Election ballot.  As this Court has repeatedly invoked Election Law § 16-100 to afford an opportunity for balloting in

-16-

support of candidates who failed to earn a place on the ballot, it should certainly invoke this same authority here for a candidate who actually had his designating petition validated.

## POINT II
## THERE IS NO BARRIER TO THIS COURT'S ORDERING A NEW PRIMARY ELECTION

There is no legitimate reason this Court cannot schedule a new Republican Primary Election.[6] See Breitenbach v. Heffernan, 245 A.D. 374, 376 (2d Dep't), aff'd, 268 N.Y. 718 (1935) (making clear that, in the absence of impossibility, a court should order a new primary).

### A.   Judge Sharpe's Order Does Not Preclude a New Primary Election

First, contrary to Respondents' false assertion, Judge Sharpe's Order setting June 28, 2016 as the Republican Primary Election date does not preclude this Court from exercising its powers to order a new Republican primary election under Election Law § 16-102(3) or § 16-100. See Trial Tr. 395:4-7 (where Respondents

---

[6]  The Trial Court's and Respondents' apparent reliance on Hunter v. Orange Cty. Bd. of Elections, 11 N.Y.3d 813, 815 (2008) for the conclusion that a new Republican Primary Election is "impossible" is misplaced. See Trial Court Order, at 3. There, in a two-sentence opinion without any explanation, the Court of Appeals found only that it would be "impossible . . . to render meaningful relief in compliance with the Election Law" in that case. 11 N.Y.3d at 815. The only explanation that can be inferred is that, after an October 17th Appellate Division decision ordering a new primary, the Court of Appeals determined on October 23rd that a new primary election—which would of course allow the parties to contest results pursuant to Article 16 of the Election Law—was not possible because those procedures would have bumped up against the impending general election. Here, on the other hand, meaningful relief can be rendered in compliance with the Election Law in that the general election is still several months away. Hunter, therefore, is inapposite.

-17-

erroneously assert that the Trial Court "does not possess the power to alter Judge Sharpe's order . . . which dictates the election calendar").

Under Respondents' interpretation, a federal court-established election calendar somehow divests the state courts of their broad authority under Election Law § 16-102(3) and § 16-100 to grant broad relief and, specifically, to order a new primary election. This interpretation is wrong. First of all, Judge Sharpe issued the election schedule because the Democrats and Republicans in the legislature could not agree on one—even in the face of the State of New York having been sued by the United States to do so. See United States v. The State of New York, No. 1:10-cv-1214, 2012 U.S. Dist. LEXIS 16126 (N.D.N.Y. Feb. 9, 2012).

But, more to the point: *nothing in Judge Sharpe's Order nullified the Supreme Court's jurisdiction under Election Law §§ 16-100 and 16-102(3)*. If Respondents were right, state courts would be unable to satisfy their obligation to order a new primary election to rectify fraud or irregularity. Nowhere in his Order did the federal court divest the state courts of its authority and obligations under the Election Law. It was only meant to set a date—because the state legislature failed to do so.

Indeed, Judge Sharpe's Order setting the election calendar is harmonious— rather than at odds—with state courts' corresponding authority to reschedule an

election.  This accords with longstanding principles of construction in New York.
See Indep. Party State Comm. v. New York State Bd. of Elections, 297 A.D.2d
459, 461 (3d Dep't 2002) (making clear that where two authorities "relat[e] to the
same subject matter," they "must be read together and applied harmoniously and
consistently" to the extent possible); Matter of Rosmarin, 107 A.D.2d 689, 693 (2d
Dep't 1985) (emphasizing that where two authorities involve the "same subject
matter," they "should be interpreted in a consistent fashion").

In any event, federal and state courts have set new election dates on many
occasions for a variety of reasons—even if it meant bypassing a federal statute.
The United States Supreme Court, for example, affirmed a federal district court's
decision to "reschedule[]" a congressional election in order to give the State of
Georgia an opportunity "to remedy the discriminatory effects of an electoral
procedure" that violated the Voting Rights Act.  Busbee v. Smith, 459 U.S. 1166
(1983) (affirming 549 F. Supp. 494, 519-20 (D.D.C. 1982)) (bypassing pre-
clearance by the Department of Justice pursuant to § 5 of the federal Voting Rights
Act); see also Public Citizen, Inc. v. Miller, 992 F.2d 1548, 1548 (11th Cir. 1993)
(applying Busbee in holding that an election for the U.S. Senate that was
inconclusive on the scheduled federal election day could be concluded three weeks
later, also bypassing pre-clearance under § 5).

Indeed, consistent with the principle that a state court can override an election governed by federal law, on September 11, 2001, the late Justice Steven Fisher, tasked with overseeing New York City's municipal elections, also then governed by § 5 of the Voting Rights Act, unilaterally cancelled the primary election after the City was attacked. No one questioned his authority to do so. See *Primary Elections Are Cancelled*, N.Y. LAW JOURNAL, September 12, 2001, at 3, col 2. Similarly, when the district lines of the New York City Council were found unconstitutional, elections were postponed. See Herron v. Koch, 523 F. Supp. 167 (E.D.N.Y. 1981).

Here, the exigent circumstances justifying a new election are self-evident: without such relief, there would be no Primary Election vote at all even though two candidates were validated for the ballot.

Thus, while Judge Sharpe's Order set July 28, 2016 as the default Republican Primary Election date, the Trial Court retained—and this Court now has—the authority to change that date in accordance with the Election Law.

## B.    The MOVE Act Does Not Preclude a New Primary Election

As indicated above, the MOVE Act, in relevant part, requires the BOE to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election." 52 U.S.C. §

20302(a)(8)(A).  The underlying purpose of this rule is to *promote and protect* the voting rights of military and other overseas personnel.

Here, contrary to Respondents' suggestion, it is possible to hold a rescheduled Republican Primary Election in compliance with the MOVE Act's 45-day rule.  The Board can act forthwith to print and mail ballots to the 229 military and other overseas voters of the Third Congressional District.

Yet even if the BOE cannot prepare and mail the overseas ballots 45 days before a new primary election, the MOVE Act still does not preclude such election. This is because the MOVE Act provides that:

> If [the BOE] . . . determines that the State is unable to [comply with the 45-day rule] . . . with respect to an election for Federal office due to an undue hardship . . . [including] *a delay in generating ballots due to a legal contest . . . the [BOE]* **shall** *request . . .* a waiver.

52 U.S.C. §§ 20302(g)(1), (g)(2)(B)(ii), (g)(3)(B) (emphasis supplied).  *Thus, if the BOE believes it will not be able to meet the 45-day deadline, as a result of a hotly-contested and protracted litigation, it is required to apply for a waiver.*

Waivers such as this—even granted after the fact—are not unusual.  United States of America v. The State of Vermont, Index No. 5:12-cv-236 (D. Vt.), an action brought to enforce the rights of Vermont's MOVE Act voters in a federal election, is instructive.  There, where nearly half of Vermont's cities and towns that were subject to the MOVE Act mailed ballots *after* the 45-day deadline, the

Court approved a settlement that extended by ten days the deadline to receive MOVE Act ballots (from Nov. 6, 2012, the date of the federal general election, to November 16, 2012). Put simply, the Court and the parties—including the United States Department of Justice—determined that *holding an election, despite the state's failure to fully comply with the MOVE Act, was preferable to cancelling the vote altogether.* United States of America v. State of Vermont, Index No. 5:12-cv-236 (D. Vt.), Settlement Agreement and Stipulated Motion for Entry of Order, dated Oct. 18, 2012 (a true and correct copy of which is attached hereto).

Other states have obtained similar extensions of the deadline to receive MOVE Act ballots, with the underlying rationale being that the MOVE Act was meant to expand—not restrict—registered voters' access to the ballot.[7]

The Court should thus reject Respondents' attempt to transmogrify the MOVE Act's 45-day rule, designed as a *shield to protect* the voting rights of uniformed and other overseas voters, into a *sword wielded to deny* Pidot his rightful place on a primary ballot. As such, this Court, in conjunction with

---

[7] See, e.g., https://www.justice.gov/opa/pr/justice-department-reaches-agreement-protect-rights-military-and-overseas-voters-illinois (describing the agreement to extend the MOVE Act ballot receipt deadline for Illinois by 14 days); https://www.justice.gov/opa/pr/justice-department-reaches-agreement-protect-rights-military-and-overseas-voters-wisconsin (describing the agreement to extend the MOVE Act ballot receipt deadline for Wisconsin by 17 days).

Beyond consent decrees agreed to by the Department of Justice, courts have also addressed situations where states have not complied with the 45-day provision. See Doe v. Walker, 746 F. Supp. 2d 667, 681 (D. Md. 2010); United States v. Cunningham, No. CIV. A. 3:08CV709, 2009 WL 3350028, at *9 (E.D. Va. Oct. 15, 2009).

ordering a new primary election, can order the BOE to immediately request a waiver of the MOVE Act.

### C.    The BOE's Administrative Burdens Do Not Outweigh the Need for a New Primary Election

Time and again, courts have required election officials to make accommodations, even if somewhat burdensome, to protect the rights of candidates and the franchise of voters in time-sensitive situations.  In <u>Ross v. Scaringe</u>, 96 A.D.2d 1109, 467 (3d Dep't 1983), for instance, the Court set aside "the statutory requirement of balloting by machine . . . in view of the obvious time constraints involved" and ordered election officials to arrange for "proper paper ballots."  <u>Id.</u>; <u>see also</u> <u>Breitenbach v. Heffernan</u>, 245 A.D. 374, 376 (2d Dep't), <u>aff'd,</u> 268 N.Y. 718 (1935) (suggesting that courts should require accommodations unless, unlike here, it is actually "impossible to conduct a new primary election in time to have the successful candidate's name appear on the ballot on [general] election day.").

Here, the Trial Court should have, and this Court should now, require the BOE to make all reasonably possible accommodations to facilitate Pidot's placement on a new primary election ballot.  The general election is still nearly four months away.  There is sufficient time for a Republican Party primary election.  The fact that the BOE may need to use paper ballots, expedite the proofing of ballots, forgo its ordinary use of voting machines, or devote additional

resources to facilitate a primary election between now and the beginning of September does not mean that such a task is impossible.  In fact, the record shows that BOE personnel believe that the time between now and a re-scheduled primary election is more than sufficient to complete its tasks to do so.

It is possible, and required.

## CONCLUSION

For the forgoing reasons, this Court should reverse or modify the Trial Court Order and (1) direct the BOE to schedule and administer a new Republican Party primary election for the office of Representative in Congress from the Third District of the State of New York; (2) direct the BOE to certify, print, and place Pidot's name on the new Republican Party Primary election ballot; (3) direct the BOE immediately to seek a waiver of the MOVE Act pursuant to 52 U.S.C. §§ 20302(g)(1), (g)(2)(B)(ii), and (g)(3)(B); and (4) grant such other and further relief as this Court deems appropriate.

Dated:  New York, New York
       July 11, 2016

STROOCK & STROOCK & LAVAN LLP

By: _____

Jerry H. Goldfeder
Kerry T. Cooperman
Nathaniel H. Benfield
180 Maiden Lane
New York, New York 10038
(212) 806-5400

*Attorneys for Petitioner-Appellant Philip Pidot*

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## 22 NYCRR § 670.10.3(F)

APPELLATE DIVISION – SECOND DEPARTMENT
PRINTING SPECIFICATIONS STATEMENT

I hereby certify, pursuant to 22 NYCRR § 600.10, that the foregoing brief

was prepared on a computer using Microsoft Office Word.

Type:   A proportionally spaced typeface was used, as follows:


Name of typeface:    Times New Roman
Point Size:          14
Line Spacing:        Double

Word Count.  The total number of includable words in this brief is 5,931.


Dated:  New York, New York
        July 11, 2016

                              STROOCK & STROOCK & LAVAN LLP

                              By: _____

                              Jerry H. Goldfeder
                              Kerry T. Cooperman
                              Nathaniel H. Benfield
                              180 Maiden Lane
                              New York, New York 10038
                              (212) 806-5400

                              *Attorneys for Petitioner-Appellant Philip Pidot*

-26-