UNITED STATES DISTRICT COURT
NORTHEN DISTRICT OF NEW YORK
-----------------------------------------------------------------
PHILIP PIDOT, NANCY HAWKINS and
STEVEN AXELMAN, Individually and as
representatives of eligible Republican Party voters in
Suffolk, Nassau and Queens County within        16-cv-859 (FJS/CFH)
within New York State's Third
Congressional District,                         DECLARATION OF
                                                WILLIAM J. MCCANN. JR

                              Plaintiffs,

-against-

NEW YORK STATE BOARD OF ELECTIONS;
SUFFOLK COUNTY BOARD OF ELECTIONS;
NASSAU COUNTY BOARD OF ELECTIONS;
BOARD OF ELECTIONS IN THE CITY OF NEW
YORK; PETER KOSINSKI and DOUGLAS KELLNER,
in their official capacities as Co-Chairs of the New
York State Board of Elections; ANDREW
J. SPANO and GREGORY P. PETERSON, in
their official capacities as Commissioner of the New
York State Board of Elections; TODD D.
VALENTINE and ROBERT A. BREHM, in their
Official capacities as Executive Directors of the
New York State Board of Elections; and JACK MARTINS.

                              Defendants.

I, WILLIAM J. MCCANN, JR., hereby declare:

1.      I am Deputy Counsel for the Defendant New York State Board of Elections in this matter, and I am familiar with the facts and circumstances of this case.

2.      The New York State Board of Elections ("NYSBOE") has not violated plaintiffs' rights under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) or the United States Constitution.

1

3. Petitioner Philip Pidot is asking this court to schedule a Republican Party primary election for the Office of Member of United States House of Representatives for the 3rd Congressional District. Having sought this remedy in the state court system, this proceeding attempts to transform this court into another state appellate court.

4. Plaintiff Pidot filed a Republican designating petition seeking ballot access for the June 28, 2016 Federal Primary[1] for the Republican nomination for the office of Member of the United States House of Representatives, 3rd Congressional District. The petition was objected to, and the NYSBOE, after a hearing process, found the Pidot petition did not have the required 1,250 valid signatures on May 4, 2016. Accordingly, Mr. Pidot's name was not certified to appear on the June 28, 2016 ballot.

5. On April 27, 2016, the objectors to Mr. Pidot's designating petition brought a proceeding to invalidate the Mr. Pidot's petition pursuant to Election Law § 16-102, and Mr. Pidot commenced a proceeding on May 6, 2016 to validate his designating petition.

6. The trial court on May 11, 2016 granted the objectors' motion to dismiss Mr. Pidot's validating proceeding on the basis it was improperly commenced. Mr. Pidot moved to vacate this order. The motion was denied on June 7, 2016. The merits of Mr. Pidot's case, at this point, had not been reached by the trial court.

7. Mr. Pidot appealed the dismissal of his validating proceeding to the New York State Appellate Division, Second Department. After oral argument on June 17, 2016, the Appellate Division reversed the lower court's dismissal and remanded for a determination on the merits. On June 23, 2016, the trial court found Mr. Pidot's designating petition was valid. The

---

[1] The date of the Federal Primary is provide for by court order. *United States v. State of New York et al*, (NDNY), Case No 1:10-CV-1214 (Supplemental Remedial Order Dated October 29, 2015)

same day the trial court heard argument as to whether a Republican primary election could be held in the 3rd Congressional District on June 28, 2016.

8.     The State Board of Elections took no position in the state litigation regarding Mr. Pidot's designating petition.  However, on June 23, 2016, NYSBOE informed the trial court it was impossible to hold a primary election[2] on five days notice.  Counsel for Mr. Pidot agreed. He argued a new primary election date should be ordered.

9.     Federal law requires that ballots in election for federal offices must be transmitted to military and overseas voters at least 45 days before the election as required by 52 USC § 20302.  The Director of the Federal Voting Assistance Program ("FVAP") may grant a hardship waiver upon consultation with the Attorney General permitting transmittal closer to the election when, among other reasons "[t]he State has suffered a delay in generating ballots due to a legal contest."   Petitioners allege NYSBOE violated their rights by not seeking a hardship waiver.

10.    With respect to the June 28, 2016 primary date, there was no basis to ever seek a hardship waiver because at the time Mr. Pidot's petition was validated, creating a contested nomination,  all parties agreed holding such primary on that date was not possible.

11.    NYSBOE took no position on whether the court should order a new primary date. NYSBOE did advise the trial court that if a new election date was ordered, the date of the new election should be 50 days out from the order to provide sufficient time to transmit federal military and overseas ballots.  There was no basis for NYSBOE to seek a hardship waiver for a potential new primary election as there was no date certain that had been ordered by the court.

---

[2] Pursuant to Election Law § 6-160 (2) "[a]ll persons designated for uncontested offices or positions at a primary election shall be deemed nominated or elected thereto, as the case may be, without balloting."

Further, if the trial court ordered a new primary there was sufficient time to comply with the 45 day transmittal requirement of 52 USC § 20302 obviating any possible need to request a waiver.

12. By written order issued on June 24, 2016, the trial court ordered that Mr. Pidot's designating petition was valid, but holding the primary on June 28, 2016 was impossible and therefore Mr. Pidot would not appear on the ballot. The court did not order a new primary election.

13. Mr. Pidot then brought a *pro se* proceeding in the Eastern District of New York seeking a new primary election which was subsequently withdrawn. Mr. Pidot then appealed the second trial court order to the Appellate Division, Second Department, arguing the lower court erred in not ordering a new primary election.

14. Meanwhile, with the matter was pending before the Appellate Division, Mr. Pidot commenced the instant proceeding now before this court on or about July 13, 2016.

15. Counsel for Pidot represented to the Appellate Division that the court should not pick a specific date for the primary election, but rather NYSBOE should be ordered to set the precise date. Ultimately the Appellate Division on July 21, 2016 sustained the lower court order and did not order a new primary. But had the Appellate Division done so, the NYSBOE could have either scheduled an election compliant with 52 USC § 20302 or applied for a hardship waiver for an otherwise noncompliant date.

16. NYSBOE Co-Executive Director Robert Brehm, and New York State's Chief Election Official, informed Matthew D. Boehmer, Director of FVAP on or about July 14, 2016, a week before the Appellate Division decision, that this matter was pending in the Appellate Division and there was also a proceeding commenced in the Federal District Court in the

4

Northern District on or about July 13, 2016.  FVAP was notified that either court proceeding *might* require the state to seek a hardship waiver if a new primary was ordered on a date less than forty-five days from the court's decision and order.  The same day, counsel for NYSBOE also informed Richard Delheim and other representatives of the United States Department of Justice, Voting Section of the Civil Rights Division of the facts and circumstances of the Pidot matters.

17.     At no point relevant to these proceedings was there a moment when Mr. Pidot was actually ordered onto a primary ballot.  Nor was there ever a primary election *date* for which a waiver could have been sought.

18.     Plaintiffs have not been effected *at all* by NYSBOE not seeking a hardship waiver because there were never circumstances requiring that it do so.  Accordingly there was no constitutional deprivation.

19.     Plaintiffs allege NYSBOE has deprived them of their rights by not scheduling a new primary.  Under state law NYSBOE does not have the power or authority to order a new primary election.  Pursuant to Election Law § 16-102 (3), the power to order this remedy resides exclusively with the courts.

### *Administering a Primary Election in the 3rd Congressional District*

20.     Administering a primary election has many components.  A primary election in the 3rd Congressional District involves 146,792 eligible voters in three county jurisdictions.  The election would be held in 175 poll sites serving 630 election districts.  Approximately 587 ballot scanners and 120 assistive ballot marking devices would be deployed.

*The Third Congressional District Statistics*

| County: | Active Enrolled Reps: | EDs: | Poll Sites: | Scanners/BMDs |
|---|---|---|---|---|
| Nassau | 81,976 | 338 | 101 | 279/101 |
| Queens | 12,616 | 82 | 19 | 43/19 |
| Suffolk | 52,200 | 210 | 55 | 265 |
| Total: | 146,792 | 630 | 175 | 587/120 |

*Pre-primary Steps*

21.     The voting process involves voters marking a paper ballot at a designated polling place that corresponds with their voting residence.  The paper ballot is then scanned into an electronic scanning machine known as a ballot scanner where the vote is canvassed and the paper ballot deposited into a secure receptacle.  Every polling place is also required to have a ballot marking device (BMD) which any voter and are designed to allow voters with disabilities to participate in the election in an independent and private manner.  The BMD assists voter in marking a ballot with the voter's selections. Whichever method is used, the paper ballot marked with the voter's choices is inserted into the ballot scanner which scans the ballot, tabulates votes and records an image of the ballot on a removable memory card.  When the polls close, the scanner will aggregate (count) votes and print a results tape(s) at the polling place.

<u>Ballot Programming</u>

22.     Preparation for the election ballots begins in earnest once the candidates/contests have been certified.  The voting system election management software is configured (programed), resulting in the production of memory cards for each ballot scanner and BMD which will inform the machine of the appropriate ballot information for each particular contest.

The election management software utilized in programming the memory cards contains the same data used by the election results reporting software which tallies the election results. The ballots contain timing marks or machine readable codes that the ballot scanners and BMD will read in order to identify official ballots only and the valid voting positions for each specific contest and candidate.

*Logic and Accuracy Testing*

23. After the ballot configuration tasks are completed, county boards of elections commence pre-election testing of the ballot configuration created for each ballot style, to verify that the software and voting system operate correctly and accurately. For this comprehensive test, a pre-determined pattern of votes on test ballots (test deck), is completed for each unique ballot layout. After successful confirmation of the configurations, memory cards are programmed and installed into each ballot scanner and BMD. A standard test deck is completed and each ballot scanner and BMD is tested, again to confirm that the ballot logic and voting system accuracy is intact. This process usually begins three weeks before the ballot scanners need to be shipped to the poll sites as it generally takes approximately two weeks to complete this part of the process. This phase also includes the installation of all security seals on each scanner and BMD, and the production of chain-of-custody travel manifests.

*Ballot Printing*

24. In conjunction with logic and accuracy testing, the ballots are approved for printing in quantities sufficient to conduct the election.

*Absentee Ballots*

25.     In order for New York State to comply with the Uniformed and Overseas Citizens Absentee Voting Act (52 USC 20301 et seq.), Military Absentee ballots and Special Federal Absentee ballots must be transmitted to eligible voters not later than 45 days before the date of the federal election, absent a hardship waiver permitting a shorter time frame.  The 45-day pre-election time period was established in federal law as the time period required for an eligible voter to receive the ballot and mark the ballot and return same to the board of elections in a timely manner, to ensure that cast ballots will be counted.

*Poll Sites/Election Inspectors*

26.     Prior to any election the county boards of elections must verify the availability of their designated poll sites, language translators, election inspectors and clerks.  The availability of scanner/BMD technical support staff must also be arranged and confirmed.

*Post-Primary*

`       27.     Once polls close, post-election tasks begin.  These tasks include researching the validity of affidavit ballots cast on Election Day, posting all absentee ballot activity in the county's voter registration system, collection of voter history, poll site ballot reconciliation, and other similar tasks, so as to be prepared for the following:

> Canvass of election results, including Absentee Ballots: Election Law § 10-114(1) and § 11-212  require ballots postmarked no later than the day before and received within 7 days after the primary to be canvassed.  The canvass is to be completed,

pursuant to Election Law § 9 200(1) within 9 days of the primary.

<u>Re-canvass of the primary</u>: Pursuant to Election Law § 9-208(1) of the NYS Election Law the re-canvass of the primary election must be completed within 15 days of the primary.

<u>Post-election audit</u>:  A manual post-election audit of randomly-selected primary day scanners (and of randomly-selected districts tabulated on central-count scanners), is required by Election Law § 9-211(1) within 7 days of the primary.

28.     All post-election tasks must be completed in a time frame which ensures boards will have sufficient time to configure, test, and print absentee ballots for the General Election in accordance with the Move Act.  Adequate time is also needed for the balance of ballot production tasks, creation and testing of memory cards for each scanner and BMD, and the preparation of all election day poll books, reports and other official materials, in time for timely and secure deployment to general election day poll sites.

29.     Local boards of elections can more specifically identify how long these necessary tasks will take for a particular election.

Dated: Albany, New York  
August 5, 2016                                       By: */s/*  
                                                     WILLIAM J. MCCANN, JR (505462)  
                                                     NEW YORK STATE BOARD OF ELECTIONS  
                                                     40 Pearl Street, Suite 5  
                                                     Albany, NY 12207  
                                                     (518) 473-5088  
                                                     William.McCann@elections.ny.gov  
                                                     *Attorney for State Defendants*