# EXHIBIT B

**Peter Kosinski**:  Okay I'd like to welcome everybody to the New York State Board of Elections meeting.  I am Peter Kosinski co-chair of the board.  To my right is Doug Kellner the other co-chair.  To my left is Greg Peterson, the commissioner.  And Andrew Spano on my far right, the other commissioner.

The first order of business today is certification of the results of the April 19th, 2016 special election.  There were contests in senate district nine and three assembly districts, 59, 62, and 65.  So this board of commissioners will certify those results.  We just need to sign the certification.

**Todd Valentine**:  We need a motion?

**Doug Kellner**:  I so move that we approve the certifications and submit it.

**Peter Kosinski**:  Second?

**Andy Spano**:  Second.

**Peter Kosinski**:  All in favor?

**Multiple**:  Aye.

**Peter Kosinski**:  Opposed?  It's carried.

**Doug Kellner**:  There are three of them or two?

**Anna Svizzero**:  The assembly one sent.

**Douglas Kellner**:  Oh I see.  So we're signing.

**Peter Kosinski**:  There's two separate.

**Douglas Kellner**:  We're signing one for the Assembly and one for the Senate.

**Anna Svizzero**:  Right.

**Peter Kosinski**:  Okay, with that completed we can open up the meeting of the regular board of elections.  Commissioners, first order of business is the minutes of April 5th, 2016.  Those minutes are in front of us.  Is there a motion to accept?

**Andy Spano**:  Motion to accept.

**Peter Kosinski**:  Second?

**Greg Peterson**:  Second.

**Peter Kosinski**:  All in favor?

**Multiple**:  Aye.

**Peter Kosinski**:  Opposed?  Those are approved.  And separately we have the confidential minutes of April 5th, 2016.  I would entertain a motion to adopt those as well.

**Doug Kellner**:  Move.

**Peter Kosinski**:  Second?

**Greg Peterson**:  Second.

**Peter Kosinski**:  All in favor?

**Multiple**:  Aye.

**Peter Kosinski**:  Opposed?  Those are also carried.  Okay, now we'll move into unit updates.  Our first unit is executive unit, Bob Brehm and Todd Valentine.

**Todd Valentine**:  We've been primarily focused upon what's come up later in the meeting on the objections for congress.  All the petitions were filed and then the objections were filed after that.  In addition we did have the presidential primary was in the middle of that.  We expect the results from the counting to be certified for us at the end of this week, is the deadline for them.  And then we'll transmit that to the parties and they in turn send it out to the delegates from there.

And then looking forward then we'll transition to the congressional primary is in June. Yeah, June 28th but then they'll, but prior to that petitions will also start getting circulated for the September primaries. So there's, it's a question of fielding calls from the three different elections and inquiries, all kind of at the same time so. That's, we've been busy, Bob.

**Bob Brehm**: I think certainly the special petition challenges, everybody in the agencies work hard to work the specs and hold hearings. And we've had a lot of cooperation from a lot of people, staying long hours to get the report for you today and certainly we never make anyone happy when we work specs because of somebody does not make it on the ballot. But that's the process. So it's been a very long hours. I think people, we put hours in, staff coming in at eight in the morning until about nine at night in order to get it done for the last two weeks. In between the special election and the primary. So it's been extremely busy. We also completed the required internal control certifications to file that with, to make our certification as it is complete.

And myself, I had the benefit on primary day to go out into Nassau County. I was down for the special area just to look. Whenever you put a special and a primary on the same date in the same spot, last time they did that was in Oneida County for that Assembly district. And they opened at different hours of the day. That was even more interesting. So I went there to observe that in Oneida, and I also went to Nassau County. And you could see the work that the commissioners and the staff did there to train, brought everybody in for training because they had a. Wherever I went, I started in Long Beach and worked my way to Elmont and then came back here for the close of the day. But everywhere they had a good plan to make sure that the people who voted on everything were closest to the door. And then if they were eligible for the next part they had to go, you know, once they finished the special election, go to the primary election for president. So they really, they had, you could tell, a relatively well, they knew what was required, the staff. And I thought it worked well. So I was pleased to see that. You know, certainly it was crowded and some of those polling sights, to have the extra tables, workers, staff, in there. But they were all very busy when I was there and I thought the commissioners and the staff did a great job pulling it off. So I just wanted to let you know that.

**Peter Kosinski**: Okay.

**Bob Brehm**:  I think that kind of covers most of our information.

**Peter Kosinski**:  Okay, any questions?  Alright then the next unit is the councel compliance unit that's Kim and Brian.

**Kim Galvin**:  Thanks commissioner.  Well, what they said, basically.  We've all been very busy monitoring and working the specs.  It's interesting because we have nine ballot access cases that were filed.  Seven of which are still active.  And just for some people listening, what we have to do is get the petitions, the specs, work the specs, get the hearing, all before the court date usually.  So the court can make a decision.  So that's a coordination effort that seemed to work out fairly well.  Two of those nine have since withdrawn or ended those cases.  Brian and Bill, we had a lot of new staff that came on since the last one.  Trained them on doing the specs and working the specs, so it was a new endeavor for a lot of the staff people, which was interesting.  They were all excited until they started to do it.

We anticipate we'll have some more litigation following today's meeting as you have three days to bring a validating proceeding.  I think that's taken up most of our time.  Except for the fact that we worked on finalizing the rest of the things on the agenda such as the FOIL document and confirming the IE reg for ready and some other stuff.  Brian do you have anything to add?

**Brian Quail**:  Those are the, that pretty much reflects the bulk of the things that have occupied the unit's time.  I would just want to mention that we did conduct two club trainings on April 6th and 7th in New York City and on Long Island.  Work to finalize the handbook is continuing.  And let's see, those are the main points.  And there are four federal lawsuits related, three federal lawsuits related to in some manner in other the April 19th primary that have been worked on very, very well by our colleagues in the attorney general's office.  And we continue to work with them on those, all three of which are open in some manner, shape, or form.

**Peter Kosinski**:  Okay, any questions for councel?  Alright.  Then our next is election operations Anna Svizzero.

**Anna Svizzero**:  Thank you commissioners.  Brenden and I are happy to be here, I'm sorry that I did miss the last board meeting.  We have been doing everything

that everybody else has said. We've been working on specs, working on reports for this meeting. Providing pre-election, Election Day support, complaint resolution regarding the presidential primary. We facilitated the ballot access filings. We received, acknowledged, and prepared all the correspondence related to 113 petitions, 62 acceptances, 54 authorizations, a number of declination substitutions, 67 sets of objections were received, 26 sets of specifications were filed. So a number of those objections do fall by the wayside.

We prepared the documents for your board of canvassers meeting for today. And we'll be preparing presidential results for the two state committees once all of those have been received. We've also collected local filer information for the congressional contests that file locally, not here at the state board. So that we can have a complete candidate list. We'll also be following up on any litigation or board determinations related to those filings locally. I believe we have 13 primaries so far. I'm not sure that any of the litigation at the local level or determinations yet to be made and the local level will affect the number of primaries in the state. But we can get you a new number once we have all the county board information in hand.

We continue to work with IT on the CAPAS system. We are, we did get approval to attend a conference on voting systems at MIT. It's going to be held in June, June 20th and 21st. Brendan will be going with Charles Smith from our staff. And also Rob Zeglen from NYSTEC. Commissioner Kellner has been asked to speak at that session. Brendan, we don't want to put Brendan right into the fire so Brendan's going to introduce everyone else. We have some papers we are going to present, our certification procedure in which a number of the attendees have expressed an interest. This conference is usually held on the west coast in Portland or places like that and travel has been prohibitive for us, so we'll be providing our reports to them, reviewing our procedure with them. Rob Zeglen from NYSTEC is the lead security consultant for our certification so he would be a good speaker to explain how our process works. And it gives us a chance to network with, for our guys to network with people who do what we do all around the country. We, right now, are at a loss for reaching out to people who sort of speak the same language. So we're hoping that Brendan and Charles, and unfortunately Bob Warren can't make it, neither can John Ferri so we're hoping to beef up our bench strength when it comes to reaching out and talking about these issues with other states. The EAC is going to have their representatives there as well, Brian Hancock and Brian has a new deputy so that'll be a good opportunity for everyone to meet everyone. And

we're just happy to be able to be in our ball park so to speak. Brenden did you want to add anything?

**Brendan Lovullo**: No I think everything is on the sheet if there's anything else.

**Anna Svizzero**: Any questions?

**Peter Kosinski**: Any questions of election time? No. Okay, thank you Anna. Next is the NVRA/PIO, John?

**John Conklin**: Good afternoon commissioners. Public information office was extremely busy over the past few weeks particularly on the presidential primary day. We had six people manning the phones in the public information office and they were busy from the beginning of the day to the end of the day. Pretty much as soon as you finished with one phone call there was another one ready to go. I don't have a specific number but I'm sure it was close to 1500 calls we probably got that day. I mean, and it was things from am I registered? Where am I registered? Where is my poll site? The ordinary kind of things. The occasional, oh the machine's not working at my poll sight or the poll site's not open yet. Or things like that. It was fairly routine. We probably had close to 700 emails. Again, similar kinds of things. Approximately 121 of them were what I would consider complaints. 60 of them were from around the state, 61 of them were from New York City, which we've attempted to address. So we had a lot to do in that period of time. Since that and with all the congressional petitions and the objections and the hearings and that stuff. We've continued to be extremely busy as everybody is called and asked questions about those materials. We had 109 FOIL requests in April, which was a significant jump, almost a doubling from the month before. I attribute that to the congressional petitions. We participated in the monthly ECA call on the 28th. Tom sent out a reminder on the Move Act surveys for the presidential primary and the upcoming June primary. We posted a list of filings on the website for the federal primary petitions. The notices for the April 21st and May 20th campaign finance compliance webinars, the webcast for April 5th and the transcripts from March 24th and April 5th, are also posted.

In light of the voter registration deadline on March 25th, we had a couple complaints from the local counties about DMV not being aware of the deadline or getting them some materials in time from Orange and Seneca Counties. Orange had said that their local DMV people were not aware of the registration deadline.

And Seneca had a package of applications that arrived the day after March 30th from the Ithaca DMV office. We confirmed that DMV received our reminder about the notice from Greg back at the end of February, we also discussed this with DMV in our meeting. They assured us that is was included in their mailbag communications that goes out to all the DMV offices. But the next notice that will be for the June primary, which is the deadline is June 3rd, the registration deadline is June 3rd. We've slightly altered the wording in it to emphasize that the registrations have to be sent in such a way that they arrive at the intended board of elections no later than that Wednesday following the Friday deadline. That's all I have. Do you have anything to add Tom?

**Tom Connolly**: The only thing that I would add with regard to the elections. Obviously we did election results on Election Day. I want to thank everyone from both election ops and IT who helped make sure that went smoothly on election night. As John mentioned be have the surveys that went out for the presidential primary with regard to the military and oversees voters. And I'll be sending out as I told all the counties on the ECA call the next batch of surveys for the federal primary.

And the last thing that we're working on right now we're going to do next week is we run our NCOA lists just because the counties have this thing out there, there notice is in August so we run our voter database through the NCOA database now so that they have, they need a cast certification. It's a 90-day window where they can get discounted rates on postage. So we're going to be running our voter list through that and we will be providing each county with the results of that kind of NCOA scrub. But beyond that I think that covers everything we've been doing.

**Andy Spano**: I have a hypothetical question.

**Tom Connolly**: Sure.

**Andy Spano**: If you had three primaries folded into one day rather than three days, would that make your situation untenable? In terms of what you had to answer, what you had to fulfill, etcetera, etcetera. Or would the work be the same?

**Tom Connolly**: There's a lot of overlap but I mean obviously depending on what primaries you're having. I mean the more parties that have primaries and different types of offices there might be some different questions that you're answering. We

also had a lot of questions, there was a misinformation that we were trying to combat with regard to difference in polling hours. People thinking that it was a new set of hours for the primary one, in fact it's been that way for a long, long time. But I mean it would probably just increase the amount. I mean the type of work is the same but the volume would probably certainly increase.

**Andy Spano**: That's my question, could you handle the volume if it tripled or if it doubled? Or is it easier having primaries spread out like this or elections spread out like this?

**Bob Brehm**: Oh it's not easy.

**Kim Galvin**: It's easier.

**Bob Brehm**: Certainly the calendar that we have that Judge Sharpe has ordered for the June calendar was something that we had recommended only the basic things that needed to be changed because we were asking the federal judge to supersede state law. Certainly the, I think the proposal before the Senate and the Assembly, that while they have different dates I think all of the windows are almost worded exactly the same. That gives more time because if we were to receive specifications and objections for all the petitions at one time Senate, Assembly, Congress, Supreme Court, all of them. We would need a little bit more time than we have now to get it done. I mean so it provides a little bit more time in that calendar. So should that one of those bills pass I think we would be better able to do a uniform primary because it gives us a little more time to actually do the mechanism. Get all the objections, work the specs. Hold a hearing that can at least be meaningful so that we're not just going into litigation because we couldn't finish in time.

So I certainly think there would be a lot of benefit to a uniform primary. We would certainly gear for it a little bit differently. I did, I think we should make our own list of issues after this learning event of the. We have not had a competitive statewide presidential primary for democrat, republican, really competitive. Because usually by the time they get to New York, we have a primary, but it's kind of already a foregone conclusion. So that was busy enough. And then all of the people that tried to promote the opening primary agenda also directed a lot of resources because they were telling everybody, I know that but do it anyway. So we were getting an awful lot of complaints to everybody, the whole building. You

know, we could see social media, we could see the reports.  Yeah, that's what it, but just scream loud and demand it.  So if you look at the number of court orders that were issued I don't think it's a lot different.  If you look at the affidavits, they're way up this year.  But I don't believe, but they're mostly not valid because it's the people who said, well go do it anyway.  So there are a lot more resources that had to go to that kind of effort.

But I think certainly we would want more phoners within that last two weeks to handle, than we had.

**Douglas Kellner**:  If you had a unified primary?

**Bob Brehm**:  Because you could not get anything else done in the building.  Because whether it's enforcement, PIO, the phones were ringing everywhere and people were calling us and you had to respond to them.  So certainly we would probably bring in some temp people and gear up just to handle that.  But if it were not a, if it were one party, if it wasn't, you know this is like once in a 30 year issue.  If we had them all in one day I would bring in more temp workers for that.  Because it would be busy.  But I think we could handle it.  Right now we're working it for the whole year.

**Andy Spano**:  But overall cost would diminish?

**Bob Brehm**:  I think the overall cost to the state would diminish because of all of the primary days and workers and poll sights open.  I mean look, we had statewide democrat and republican, you're not adding that many more for all of the other parties.  Every polling site had to be open.  Every worker had to be there.  So from a human resource and poll site there's not much, the only added cost would be the ballots you'd have to print for those other political parties that are having a primary.  So certainly one primary, unified, would be much easier for us to plan.

**Andy Spano**:  You want to opine on why we don't have one primary?

**Bob Brehm**:  Well we don't seem to agree on a date.

**Andy Spano**:  Thank you.

**Peter Kosinski**:  Good.

**Douglas Kellner**: Commissioner?

**Peter Kosinski**: Oh, sorry.

**Douglas Kellner**: Could you tell us what the state board is doing with respect to the various investigations going on now about the reports of registration cancelations in Kings County?

**Tom Connolly**: What I can speak to is that I know we've been looking at the information that we have on our end as far as the transactional records that we've received from New York City and Kings County specifically. I think that we still need to try to have our IT people work with, talk with their IT people, to try to understand what processes are in place or are not in place or that should be in place. Because from what we can tell we don't seem to agree on, they believe they sent us a whole bunch of information last year with regard to some of these voters who were purged. But as far as we can tell from our records we did not receive nor reject any transactions. We did receive them all in February and so I think that we can account for all the different transactions. I think that there's a discrepancy in understanding when they were initially sent or resent or whatnot. And so I think that's what we're trying to figure out now.

**Douglas Kellner**: And why Kings as opposed to the other four boroughs?

**Tom Connolly**: Well I think that we see, I mean I can't speak to why Kings specifically. I think we did see some consistency between all the different boroughs with regard to certain, I'll call them lag times, in transactions being sent to us. And I don't know if that's just because of the process that all the different borough offices work before they send us transactions for purged voters. But I don't know why Kings, a single borough, had let's say a statistically significant more, higher number of purge voters than the other boroughs.

**Douglas Kellner**: And are we participating in any of the ongoing investigations besides what you've reported on?

**Tom Connolly**: I mean to my knowledge all they we've been trying to do is get an understanding of what's been happening on our end. So that we can kind of full in whatever gaps we can but obviously we're only the recipient.

**Douglas Kellner**:  Are you doing that coordinating with the city board IT staff?

**Tom Connolly**:  Yeah I mean at this point we have not had a meeting between our IT department and their IT department.  I believe my understanding is that that is the intent.  So that we can make sure that we have, on both sides, have a full understanding of what actually transpired and how to make sure that it works as it should going forward.

**Risa Sugarman**:  Commissioner I think I can also insert that I've been in contact with the attorney general's office and we are at this point sharing information as to the complaints that I've received and the complaints that they've received.

**Bob Brehm**:  I think from our point of view we've talked to the city board and trying to get their time to finish their certification as well as us to do the petitions.  But to look as quickly once we certify the presidential primary and certify the candidates for the June primary, which the deadline is tomorrow.  To then whether it's by a conference call or a visit to the city board, two issues.

In general the computer issues that we, that Tom described that need a fuller conversation to understand what is being claimed and what we can see through the electronic logs that are kept.  And the second issue, I think most importantly in New York City and in Kings County was the procedures that were used by the staff to make decisions on who to purge or not.  Because it's my understanding from what I've read, and I think in some of what I've heard but I don't have all of the parts yet, is that the statement is that they're going to reinstate certain people that were purged inappropriately.  So we need to review with them to make sure that there's a complete understanding under that, under NVRA Help America Vote Act and the state statute, as to what are the proper procedures in place, and where did that go wrong if it went wrong?  To make sure that everybody is trained on what are the proper list maintenance requirements and that they at least have an internal control to verify that those steps.  And it could be they understand the steps but something went wrong in their internal control.  But I don't know enough yet.

But certainly we would want to make sure that we all walk away from there, these are the correct procedures to use.  And then going forward that's what will be used.  But that step hasn't happened yet because of all the time to get the certification.

**Douglas Kellner**: Certification and petitions. So it's my understanding though that we will be working with the city board and with the Controller Stringer and the attorney general. Work through the investigation to figure out what went wrong, if anything.

**Todd Valentine**: Well we haven't been contacted by any other agency other than the city board. So they have not reached out to any of us. So I mean this is the first I'm hearing that they've spoken with Risa. So I was not otherwise aware of that.

**Bob Brehm**: Up to Election Day, and I know Risa, any concerns that voters, that enforcement that weren't necessarily an enforcement but more of my record needed to be checked. We followed up on those that she sent to us. Whether it was New York City or not and tried the best we could, at least up until Election Day. It's hard for me to do that for the ones that came late in the day on Election Day but certainly we were able to help people correct the record, in many instances people were misunderstood of what their enrollment was. But certainly anything we received whether it came from enforcement or the phones or PIO or anywhere. Our first goal was to look up the record and try and get people useful information. When it was no longer possible to get the record straight to be in a poll book, than is it an issue that they should, that the board made the correction but if the poll books printed and their name won't appear on the poll book, they should have an affidavit or see a judge to get a court order? As you got closer to Election Day it was more see a judge, get a court order, because there was only so much you could do. Try to get a court order.

So we tried to do all that kind of work up to that period of time. We did talk to many, many people. And I think we had cooperation from a lot of the boards, even the city, with the volumes that were happening to look up the specific record and try and provide that to the voter. You know, I would have never registered, not in that party, but if you look at the voter history on many that I looked up they voted in every general election, never a primary, but they're not in the party. But they claim to be enrolled in a party. Because that's probably how they voted when they made their selections in the general election. But there was no record and when you looked at the buff card three times they checked no party. And it was things like that and we would give them the record. They would still argue with us but that's their signature and their checkmark.

**Bob Brehm**: You had to look each one up because there were times where the board missed a change that was timely. And they made that correction and they told the people go for an affidavit and they would count it. So I can't, that's why you have to look up every one. Because some people are right, some people are wrong. All we can do is get them an answer.

**Peter Kosinski**: Okay. Alright, thank you. The next report is from ITU, I notice there's no one here from there. Are you guys going to, Todd you?

**Bob Brehm**: Yeah certainly we had a discussion at the last meeting of the role out of the changes to the NYSVoter system. We did not make that roll out for a number of reasons. Mostly we were not comfortable that it was ready yet. And it's not ready yet. So we're, when we will come up with a new estimated time once we are comfortable that it's ready. I don't foresee that in the very near future because of the other elections that we're also dealing with.

From that perspective we have submitted requests for some of the temporary help that we have money in the budget to pay for. For both the NYSVoter and the bigger issue is the enhancements to the campaign finance and the candidate management system, to get more temporary help in the building now that we are a little, we're very far along in the development of the business roles, it's the time to develop, based on the business roles, what we want the systems to do.

So we have different pots of money. The pots of money that are through the state information technology office temporary help has to be applied through them out of their pot of money. The pot of money that's in our budget for contractual for the technology, the office of general services handles that. We had conference call with them. We have submitted those documents to them, we're just waiting for a couple of the other items to get approvals on them. It's that old technology PTP, which I forget what the acronym stands for.

**Todd Valentine**: Plan To Procure

**Bob Brehm**: But it's a technology related approval that doesn't take long but it's just to get those help. So those would be the temporary helpers in the building to help build the system and make sure our people can run them on the run. So we're moving forward on those issues.

Certainly the IT department was very busy with the election night results coming in. There were a lot of unique things in this cycle that we had to accommodate. The biggest issue I think is the special elections. Getting the numbers to make sure that we're not reporting inaccurately from the systems and so because we had four special elections and the presidential on the same day. And we had candidates withdraw till Monday, we were still able to accommodate it. So I think they did a great job in that area to help us. I'm not sure if we have anything else. Todd?

**Todd Valentine**: No I think that covers it, Bob.

**Peter Kosinski**: Okay, any questions on that topic? Okay than our last unit report is from Risa Sugarman, Risa.

**Risa Sugarman**: Thank you commissioners. As everyone has said we were very busy on primary day. I was at my computer all day answering questions when Bob was out. Answered those emails, we had referred them to Bob and Todd for them to answer before primary day, but we helped. And my secretary was on the phone for the weeks before, answering questions, as was the rest of the staff.

Some of the questions that were in addition to registration on primary day, and before, were the hours of the voting. But on primary day I got questions about time off for voting, which I answered with the help of Todd. He helped me out with the statute so I gave that out to voters. To help them and their employers giving time off to their employees to vote. Obviously that was more for people out of New York City who had or the counties that didn't have from six in the morning to nine at night that had the noon to nine voting. In addition some of the questions or complaints that I got were for access to the polls for people with disabilities. That it was difficult for some people to have access to the polling places. So those are complaints that we got. A couple of them, mostly in New York City, having access, being able to get into the polling place to vote. And it's been a little busy for me in the last week, other than that, that's my report.

**Peter Kosinski**: Okay, any questions? Okay, that completes the unit reports, the unit updates for today. So we'll move on to old business. And our first item under old business is the FOIL guidance document which I know Brian's worked on. I believe Kim maybe has worked on it as well. But at any rate, Brian do you want to talk to this, speak to this?

**Brian Quail**:  Very, very briefly yes, commissioner.  And certainly we are available to answer any questions the commissioners may have with this issue, has been evolving on the agenda for quite some time.  And this is a consensus draft that attempts to take and pull together various relevant sections of the election law that are on the topic of voter registration and records access.  And to place the information in a format which is more useful to commissioners at local boards of elections who are making determinations on making these records available.  And so it is a compilation of those provisions and basically runs through in a stepwise fashion from a general rule to various exceptions.  How to uniformly apply request for access to those records.

**Douglas Kellner**:  And we call this now guidance on access to copies of voter registration records.  This is intended for the county boards of elections, is that correct?

**Brian Quail**:  It is intended for county boards of elections.

**Douglas Kellner**:  I move for the adoption of the resolution.

**Andy Spano**:  I second.

**Peter Kosinski**:  All in favor?

**Multiple**:  Aye.

**Peter Kosinski**:  Opposed?  Alright, it's adopted.  Our next item is the resolution on the amendments to the independent expenditure regulations.  I believe these have been out for public comment for some time and these are now, as I understand it, coming back to us for final approval.  I guess my first question is whether we received the comments on our initial draft?  And if we did, did we address them?

**Bill McCann**:  Commissioner we did receive one comment from Common Cause that was generally fare able.  They did raise one technical issue concerning the identification of whether the candidates were being supported or opposed by the independent expenditure.  Just a couple things to address that.

Firstly the regulation and the statute currently require that when they file their weekly 24-hour reports relative to their IEs that they have to identify the office and district relative to the expenditure.  And they also have to identify the clearly identified candidate in that filing.  In addition on the registration documents the committees will identify those candidates that they are supporting or opposing.  And then in the context of this round of regulation we have created a new form which is a CFO-6 which is a notice of intent to engage in independent expenditures.  And on that form, whether it's an IE committee or a PAC, they will identify the candidates that they are supporting or opposing through their independent expenditures.

So we believe that through the process we capture that statutorily and through the regulation the new system that we are currently developing will have more robust features relative to disclosure of that information.  But as it stands now we believe that under our current system we do capture that information.

**Peter Kosinski**:  Okay and as I understand it these changes that we're adopting basically are reflecting the statutory changes that were made to the independent expenditure process last year by the legislature.

**Bill McCann**:  Correct.

**Peter Kosinski**:  Okay.  Any questions on this topic?

**Douglas Kellner**:  Before we vote on this I just want to clarify that this is the initial regulations which we're promulgating because there's consensus in that we're continuing to work out a more detailed draft, right?  Of additional regulations that will provide clarifications and safe harbors.

**Peter Kosinski**:  Correct, that's my understanding as well.  Okay is there a motion to adopt this set of regulations?

**Douglas Kellner**:  So moved.

**Peter Kosinski**:  Moved.  Second?

**Greg Peterson:** Second.

**Peter Kosinski**: All in favor?

**Multiple**: Aye.

**Peter Kosinski**: Opposed?  They are adopted.  And then our last item is a discussion item as it's identified here.  It's on the political clubs.  I know that there's been some training, I believe at our last meeting we were informed there was some training that went on, on political clubs, I don't know how that went.  I don't know if there's more to report on that.

**Brian Quail**: I guess I'll start.  There Commissioner Kellner had provided a series of questions on political clubs.  And I, prior to the last board meeting, drafted some answers to those questions involving essentially, what is it that, well the specific questions for example are, is a club required to file if it never receives or expends any money in connection with an election.

And there was a series of other questions that were in the vein of trying to capture the basis for what we need to agree on to give good advice to people on how to know when they have to file and what kind of activities bring them into that orbit.  And what the statutory basis for all of that is.  Bill drafted a set of responses to the same questions just recently.  The answers are the same but how we get to some of them are different.

What is clear to me is that we have provided answers that if read by a lawyer who has some knowledge of what's going on in the election law, we've done something good.  But what we have not yet accomplished, and in the last, in the interval since the last meeting, we have just not gotten to it.  We need to, as Commissioner Kellner made very clear at the last meeting, have a tool that is decipherable by people who are having to make the practical decisions of what am I doing in my neighborhood with my people who agree with me and in the political club and what of these things that I am doing might make me have to have a filing requirement with the state board of elections?  And so while there's some differences in how the approach is to the questions it seems that in the final estimation the answers are not necessarily so difficult to communicate if we make a list of the kinds of specific activities that would require filing and the list of activities that would not cause someone to have a filing obligation.  And in this process, and it's been very instructive to me and I think also to Bill and Kim, is we've had an opportunity to really review the 40 years of opinion history that the

board has.  And on several occasions from different angles the issue of can I do this or can I not do this and if I do it do I have to report and file has come up in numerous different contexts.  And I think that as we continue to move through this process we should be able to produce a guidance document that will be decipherable by people who are actually using, who have obligations under the law and we can help them fulfill those obligations.  But we are not there yet.

**Andy Spano**:  A lot of this also is not only the comments by Commissioner Kellner but your experience at the training programs, correct?

**Brian Quail**:  Right.  The two trainings of political clubs in New York City and Long Island, clearly indicated that there is some confusion out there in the world.  I think we did an excellent job representing the board, our staff obviously, in making sure that everybody who attended those trainings got the answers to the questions they posed.  I mean it was enlightening to see how their struggle unfolded and the kinds of issues that they have.  And that will also be invaluable and enlightening a guidance document from us to help meet their needs and provide clarity in an area where there is admittedly, all the way around, a lot of statutory complexity.  But if we move away from the statutory language and we look at the end activities of the entities and say these end activities, theses actual on the ground activities, will require you to file, and these other activities do not.  I think we can provide meaningful guidance that is simple and comprehensible to the public.  And we need to do that.

**Peter Kosinski**:  Yeah I would suggest that that goal goes beyond political clubs.  You know, that's something we should be trying to achieve for anybody out in the community who's engaged in anything that relates to a campaign or a political party or a political activity that they should be getting guidance that they can understand.  Because I agree it's not useful to repeat the statute to them if the statute is not clear.  I think it's our job to clarify it so people have a common sense every day, because these are not lawyers a lot that work in this field.  So it suggests that they can read the statute and understand what they have to do is not realistic.  So again I would just urge you that this goes beyond the clubs, this goes to any political committee or so called political committee, to understand what their obligations are.  So I think that's a goal we should try to achieve generally.  Now do we have more training scheduled this year?

**Bill McCann**:  Yes.

**Peter Kosinski**:  And when will that begin?

**Bill McCann**:  They've already begun.  They've already begun.

**Kim Galvin**:  Regular trainings.

**Bill McCann**:  Yes, regular trainings.

**Peter Kosinski**:  And so you find that in the political club world there are unique types of questions that arise that you don't see in the other training sessions that you conduct?

**Bill McCann**:  Well clearly when you have committees that are a candidate committee or a PAC.

**Peter Kosinski**:  They're more political.

**Bill McCann**:  Or political party committees, they engage in very particularized activity that make it clear that they have an obligation to file and disclose that activity.  Where you have some of these other entities, because if you read the definition of political committee there's some carve outs talking about political issues etcetera, where they don't necessarily rise to being a matter that would require some disclosure.  And where do you delineate that and how do you advise people that they may have crossed the threshold, etcetera.  So for these clubs or other organizations it's just an issue of have they crossed that line or not?  And what activities, as Brian eluded to, can you engage in or if you engage in does it put you over the line or not.  And often times there's a combination, unfortunately a lot of these things blend.

**Peter Kosinski**:  So the issue there isn't really what do I have to do to file, it's do I have to file?

**Bill McCann**:  Absolutely, that is the clinch pin issue in that regard.

**Peter Kosinski**:  Okay.  So what is your expectation as far as getting something together that would be in this form you're suggesting of easily understood?

**Brian Quail:**  My, Commissioner I think it is very helpful to hold it over on the agenda.  Short of issues that would get in the way I think that we should be able to accomplish that by the next meeting.  In fact, certainly it would have been our intention to have that happen for this meeting but for the intervening ballot access filings, the lawsuits, and an election.  But I think just holding it over for another month would be the recommended course that should get us to where we need to be to further the discussion.

And it is a really important threshold issue that on what is it that makes the obligation to have to file that.  And while it is certainly very applicable to clubs over the years it has occupied a significant amount of the opinion activity of the board.  Particularly in the 1970s.  There are implications for other types of entities.  So a distillation of that body of law in a comprehensible manner I think would be very useful.

**Peter Kosinski:**  Okay then we'll expect something at the next meeting so we'll hold it over until then.  Any other questions?  Okay.  That completes the old business section of the agenda.  The next item is new business.  And the first item is petition rulings.  And I believe we have a report here, this is the staff report on the both prima facie reviews and those that were specified, specification, objections.  And I have a list of findings of the staff through a hearing officer process on each one of the petitions.  Are there any, does anyone want to present something or are there questions, or?  I have the report, I think all the commissioners have the report.  I guess I could handle it either way.  If somebody wants to make.

**Douglas Kellner:**  I'll move the adoption of the report.  And if Mr. Ciampoli, did you want to speak to any of these?

**John Ciampoli:**  I have two that I'd like to speak to.

**Douglas Kellner:**  Are they up now?

**Peter Kosinski:**  I don't know are they?

**Kim Galvin:**  Yeah I believe so.

**Todd Valentine:**  Yeah I believe they're on there.

**John Ciampoli**: If I may?

**Peter Kosinski**: Sure.

**John Ciampoli**: On the independence party petition in the third congressional district we believe that the report should reject.

**Kim Galvin**: Just one second John. That's the second page.

**Peter Kosinski**: Independence party petition third congressional district.

**John Ciampoli**: Correct.

**Kim Galvin**: I believe he's talking about.

**Peter Kosinski**: Candidate?

**John**: Candidate Jack Martins.

**Peter Kosinski**: Okay.

**John Ciampoli**: Okay, we believe that the specifications that were perfected should in fact be rejected by the board. The board received the specifications without proof of service. Within 48 hours a letter came in.

**Karen Galvin**: He's talking about the second set.

**Peter Kosinski**: I'm sorry, can I just stop you for a minute? Okay, because I'm seeing two different sets of objections.

**Karen Galvin**: Not the valid petition, the one where it's deemed invalid.

**Peter Kosinski**: Okay, I'm sorry. Okay, go ahead.

**John Ciampoli**: The letter specified no objector whose objections the proof of service related to.

**Kim Galvin**:  You want me to go grab the file?

**Peter Kosinski**:  Maybe we need to see it in order to understand what you're talking about.  Is that fair to say?  I'm not quite clear what you're saying.

**Kim Galvin**:  Well just in case, I'll grab it just in case.

**Bob Brehm**:  They're all in the carton, so in congressional order.

**Peter Kosinski**:  Let's just hang on a minute John.

**John Ciampoli**:  Okay.

**Peter Kosinski**:  Might be easier if we looked at it.

**John**:  Okay, it's easier with the documents.

**Peter Kosinski**:  You said you have two?

**John**:  Two.  I can go on to.

**Peter Kosinski**:  Do we need the documents for the other one as well?

**John Ciampoli**:  No.

**Peter Kosinski**:  Well then why don't you speak to that one.

**John Ciampoli**:  One the same congressional district, third, the objections to the petition, they were ruled out.

**Peter Kosinski**:  I'm sorry, which party?

**John Ciampoli**:  Republican.

**Peter Kosinski**:  Republican.

**Todd Valentine**:  On the last page.

**Peter Kosinski**:  Okay, okay.  So Pidot third, got it.

**John Ciampoli**:  The recommendation is to invalidate.  I'd just like the board to note for its records that the hearing officer was kind enough to allow the respondent to recess the hearing to allow the respondent to present a defense.  We never heard from the respondent thereafter.  And I'd like that noted in the board's records because there is pending litigation and I think it'd be relevant in that litigation.

**Peter Kosinski**:  Okay, so you're not challenging this?

**John Ciampoli**:  No.

**Peter Kosinski**:  You just want to make that statement.

**John Ciampoli**:  Right.

**Peter Kosinski**:  Alright then we'll move on to the other one when.

**Anna Svizzero**:  I was the hearing officer there and it is noted in the record.  They didn't provide anything at the end of the hearing.  Nor did they when we re met on Tuesday.  So that already has been taken care of.

**Peter Kosinski**:  Okay, good.  We'll just wait a minute for the file.  Is there anybody else here on any, you guys aren't here on any of these other petitions, right?

**Douglas Kellner**:  You want to discuss our next meeting while we're waiting?

**Peter Kosinski**:  Go ahead.  Yeah I've got some issues with June.

**Douglas Kellner**:  Me too.

**Bob Brehm**:  The only date that we need you to firm up that is a real date that we need is August 8th.

**Peter Kosinski**:  Hold on a second, let me just get that in here.  Well let's, one thing at a time.  August 8th is a day that we have to meet is what you're saying?

**Bob Brehm**:  Well that is the date we meet to certify for the September primary.

**Peter Kosinski**:  Okay so by the first week in August or should we meet on the 8th?  It doesn't matter.

**Bob Brehm**:  Well if we.

**Peter Kosinski**:  Well we can talk about that.  You need to talk about that now?  Let's talk about June.  Or do you want to do, you want to do August?

**Douglas Kellner**:  No I agree if we're going to meet the first week in August we should meet towards the end of June.  That's our next meeting.

**Peter Kosinski**:  Well I can't meet until the last week.

**Douglas Kellner**:  Until the last week? The week of the 28th?

**Peter Kosinski**:  I can either meet the first week or the last week.

**Douglas Kellner**:  The first week I can't.

**Peter Kosinski**:  Okay.

**Peter Kosinski**:  That's the congressional primary.

**Todd Valentine**:  That's the congressional primary.

**Peter Kosinski**:  Does that effect you?

**Douglas Kellner**:  No.

**Peter Kosinski**:  I was going to check with you.

**Douglas Kellner**:  Except maybe we need to be in the field that day.

**Todd Valentine**:  They're going to be busy.

**Douglas Kellner**: What about the 27th?

**Peter Kosinski**: I can do the 27th, or the 29th.

**Todd Valentine**: Okay, the 30th.

**Douglas Kellner**: Okay 30th.

**Peter Kosinski**: Yeah, 30th. Alright 30th, 30th it is.

**Andy Spano**: We have no meeting until that date?

**Peter Kosinski**: Correct.

**Andy Spano**: I had something on the 26th, that's why I was.

**Peter Kosinski**: The 26th, you did?

**Andy Spano**: Yeah I got it right here.

**Peter Kosinski**: For us? For us to meet?

**Andy Spano**: Yeah maybe I put it down in the wrong spot, I don't know.

**Peter Kosinski**: I'm not aware of us doing anything.

**Andy Spano**: Well I'm happy with that.

**Peter Kosinski**: Okay.

**Andy Spano**: June 30th?

**Peter Kosinski**: 30th is

**Douglas Kellner**: Well, so there's your proof of service, right?

**Kim Galvin**: Here's the proof of service.

**Kim Galvin**:  What his argument is, I believe, is that the specific objectors on whose behalf this was being filed was not clear based upon the case that he had. But later that same day the gentleman, a lawyer, submitted this document specifying the objectors and included a copy of this document.  We accepted that as well.

**Peter Kosinski**:  So he had a case that this is not sufficient?

**Kim Galvin**:  Well arguably it was not sufficient because.

**Douglas Kellner**:  The lawyer couldn't know what spec that the certificate went with?

**Karen Galvin**:  Right.  There was three objectors originally in this case and one dropped out.  So you didn't know that the specs were being perfected on behalf of the two that were continuing on.

**Peter Kosinski**:  Right.

**Kim Galvin**:  And then the affirmation that he filed on the same day cleared it up and the gentleman signed his name and submitted a copy of the original document and was filed.

**Peter Kosinski**:  Now is this the objector or is that the?

**Kim Galvin**:  This is the attorney.

**Peter Kosinski**:  The attorney.

**Kim Galvin**:  This is the attorney.

**Peter Kosinski**:  So

**Kim Galvin**:   This is not applicable because CPLR says it's only in court, I haven't been there since yesterday.  But on behalf, it had it just so the objective here in pencil would have been completely subject to.  Do you have any other questions?  Mr. Spano?

**Andy Spano**: I'm okay.

**Karen Galvin**: Okay.

**Andy Spano**: If you guys are okay I'm alright.

**Kim Galvin**: Alright.

**Andy Spano**: I don't understand it.

**Peter Kosinski**: Okay.

**Kim Galvin**: I could.

**Peter Kosinski**: You can take those.  I don't think we need it.  I'm going to let him know.  John you want to finish up then?  We've looked at the documents, go ahead.

**John Ciampoli**: To go back to what we were talking about.  The board received the specs with no proof of service.  In 48 hours we received a letter which had proof of service attached to it, however that letter did not specify which objector's proof of service that was.  And there were multiple objectors who perfected objections in that district on that petition.  Subsequently you got what purports to be an affirmation which is handwritten.  Which does not have proof of service attached to it, saying when I sent you the letter this is whose proof of service, these are the objectives whose proof of service were attached to that letter.

**Peter Kosinski**: I'm sorry John.  John can I go back just a second?  I am looking at that letter, it does.  There is a proof of service attached to that affirmation.

**John Ciampoli**: Not to the affirmation to the letter.

**Peter Kosinski**: Am I wrong?

**Kim Galvin**: No you are not wrong.

**John Ciampoli**: It's a photocopy of the letter.

**Kim Galvin**:  Here's the letter.

**Peter Kosinski**:  And this proof of service up here.

**John Ciampoli**:  It's a photocopy, it's not the.

**Peter Kosinski**:  Oh I see, it's not the original.

**Kim Galvin**:  The photocopy of the original that was what.

**Peter Kosinski**:  I got you.  I see what you're saying.

**John Ciampoli**:  A photocopy of the letter.

**Peter Kosinski**:  Okay, fair enough, John.  I got you.

**John**:  It's saying the same thing.

**Peter Kosinski**:  Okay, go ahead.

**John Ciampoli**:  And the point is, that affirmation and anything attached to it is not an affirmation.  Under 2106 of the CPLR an affirmation may only be offered by an attorney in the context of a court proceeding.  So what you have is a piece of paper that purports to be a sworn statement that is not a sworn statement.  If it were an affidavit of service, and it was sworn, and it was notarized, I wouldn't have a problem.  My problem is that that last handwritten piece of paper that you got.  Is a nullity, it's nothing.  And therefore it does nothing to cure the defect in the letter which had the actual proof of service attached to it.  Therefore the board properly should have rejected the specifications and that would leave the petition valid.

**Peter Kosinski**:  So you're saying John, if I understand your position, that you would accept an affidavit of service being filed by the attorney of record but you will not accept an affirmation by that same attorney?

**John Ciampoli**:  There was no attorney of record at that time.  There's no caption. There's no index number on that affirmation.  It does not relate to any case that was pending.

**Peter Kosinski:**  Well let me understand something, though.  If this individual attorney who filed the affirmation had filed an affidavit of service instead of the affirmation.

**John Ciampoli:**  That would be sufficient.

**Peter Kosinski:**  Okay, so the affidavit would be, the affirmation would not be.

**John Ciampoli:**  That's because it's not an affirmation is what I'm saying.  By the technical, in the context of the CPLR which grants an attorney the power to issue a sworn statement without it being notarized.  Without it being sworn to.  That is not an affirmation.  It doesn't meet the definition under the CPLR.  Because there was no lawsuit pending.

**Peter Kosinski:**  Okay, because it's not done in the context of a court proceeding.

**John Ciampoli:**  It does not carry the caption, the index number, or state that it relates to a court case.  And it wasn't offered and it would have to be offered in the context of that court case.  So an affidavit of service that I served in order to show cause is permissible, but an affirmation of service here in an administrative agency, I don't have the power under the law to issue the affirmation.  So it's a nullity, it's not an affirmation.  The CPLR doesn't provide for it in administrative proceedings, only in court cases.

**Peter Kosinski:**  Okay.  Any more questions of the commissioners?

**Douglas Kellner:**  We don't require an affidavit; we just require proof of service.

**Peter Kosinski:**  Yeah, I mean I guess it's not.

**Greg Peterson:**  We just require proof of service right?

**Peter Kosinski:**  Yes.  Proof of service is in the statute.

**Greg Peterson:**  So that election law calls for a…

**Douglas Kellner:**  Well it's our reg.

**Greg Peterson**:  Our reg.

**Peter Kosinski**:  It's our reg.

**Douglas Kellner**:  Our regulation.

**Greg Peterson**:  For proof of service which we do have.

**Douglas Kellner**:  It doesn't require an affidavit.

**Greg Peterson**:  And right, wrong, or indifferent the bottom line was when they did the count, the count unfortunately was short.  So it's a question of, now you have the whole thing and you have a count but basically fall short of what is required.  How do we at that point just go, oh wait a second, there's a technicality here where we were trying to hang our hat on.  As much as I may love Jack Martins, I just don't feel comfortable in, I've used the expression before in trying to squeeze the toothpaste back into the tube.  Once we know that the filing is short of the required signatures I don't know how we can overcome that.

**John Ciampoli**:  Well commissioner if I can respond to that.  This would not be the first time this board has put a candidate that did not actually have the required number of signatures onto the ballot.  I can personally attest to that.

**Douglas Kellner**:  But it would be the first time we rejected a specification on these grounds.

**Bob Brehm**:  And we've accepted photocopies…

**John Ciampoli**:  Well because, well how many times have you has an affirmation submitted to you as proof of service?

**Douglas Kellner**:  We don't even require an affirmation.

**John Ciampoli**:  I understand that.

**Douglas Kellner**:  We've had less than that as proof of service.

**John Ciampoli**:  I understand that but the letter standing alone, if the affirmation is a nullity, okay, the letter standing alone is insufficient.

**Douglas Kellner**:  I think we hear you but we were able to process, alright.

**Peter Kosinski**:  Yeah I think we should.

**Greg Peterson**:  I think we understand.

**Peter Kosinski**:  Anything else?

**Douglas Kellner**:  Alright so I made my motion.

**Greg Peterson**:  Appreciate the argument, John.

**Douglas Kellner**:  But unfortunately I think it falls a little short.

**Peter Kosinski**:  We have a motion by Commissioner Kellner to adopt the report as submitted.  Is there a second?

**Andy Spano**:  Second.

**Peter Kosinski**:  All in favor?

**Multiple**:  Aye.

**Peter Kosinski**:  Opposed?  Okay.

**Bob Brehm**:  So for candidates listening to our webcast, the notice to candidates if they are, will go out by overnight mail unless they have communicated to us earlier that they would accept it by email.  That will be done as soon as the meeting's over.

**Peter Kosinski**:  Okay.  We have one more piece of business under new business, this is the guidance on, well actually relating to the Hispanic Leadership Fund court case that was, the decision was rendered some time ago.  I can't remember the exact date, some time ago.  So this is a new piece of guidance that is stored and put out to those seeking to follow the Hispanic Leadership Fund court case.  Is

anybody, Brian or Kim, do you want, or Bill, do you want to speak to this or do you have questions?

**Douglas Kellner**: I don't have it in my packet. I've read it but I don't, there it is. Okay, thank you. Okay, sorry.

**Peter Kosinski**: Okay I think Bill. Bill do you want to explain this?

**Bill McCann**: Sure as the commissioners may recall a couple years ago there was a bevy of law suits that occurred at the state and federal level that the board was not a party to. And at that junction the board had issued some guidance concerning the application of the $150,000 aggregate contribution limit to individuals. And also as it related to that limit, in relation to independent expenditure committees.

At that time when the board issued that guidance this matter was pending. And so the issue of whether or not the aggregate $500,000 corporate limit would apply to corporations making contributions to independent expenditure committees would apply or not was still in flux. Subsequent to that the court did render a decision in an as applied context and ruled that as applied this 501c4 corporation Hispanic Leadership Fund, Inc. They found that, they ruled that the board was enjoined from enforcing the provisions of 14-116(2) against the plaintiffs, which were Hispanic Leadership Fund Inc. and freedom New York was the pack, or the independent expense agreement law particularly, that would have received this contribution. And so this guidance document would simply state that as applied, and based in the context of the other litigation, that it would be unenforceable to say that in the case of Hispanic Leadership Funding, that they could make unlimited contributions to independent expenditure committees but that any other corporation could not. So this merely takes the as applied in that very specific context and applies it across the board. And it closes that loophole.

**Douglas Kellner**: We previously adopted an opinion, why have we changed it to guidance status as opposed to opinion?

**Bill McCann**: That was not in the context of an opinion. That was merely a resolution that the board voted on in a board meeting. There was not an opinion that did that. There was a resolution passed by the board, there was specific language that was read at the board, and the board then adopted that language,

which then went into a guidance document that was issued to the public.  So this does follow that format.

**Bob Brehm**:  I think from us, where when we have guidance, is where do we put it out so the public can see it?

**Peter Kosinski**:  Well is there a difference in legal as to whether it's guidance or a formal opinion by this board.  Is that?

**Bill McCann**:  I don't think that.

**Douglas Kellner**:  The statute uses the word opinion in several places.  But it doesn't use the word guidance.

**Kim Galvin**:  I don't think it would be a problem if we changed the format.  Make it an opinion, it's just we haven't had an outside request.  This was a board-initiated process.

**Peter Kosinski**:  Yeah, I mean I don't think that matters as to whether we do an opinion, whether we generate it or someone else asks us for it.

**Douglas Kellner**:  And I'm just thinking of where is goes on the website.  We publish opinions, opinions are numbered by year and.

**Peter Kosinski**:  No I tend to agree and I.

**Kim Galvin**:  I would just suggest that we do the other one as well and perhaps put them together.  The other resolution on the individual aggregate limit.

**Todd Valentine**:  I was thinking that.

**Andy Spano**:  Make them both opinion.

**Kim Galvin**:  And do this one, we could make them both opinions, yeah.

**Douglas Kellner**:  As a single opinion.

**Bob Brehm**: Would we want to adopt a guidance for this meeting and then we can turn it into an opinion in the future, or not, do the guidance now.

**Douglas Kellner**: That's okay.

**Peter Kosinski**: You know I don't care either way.

**Douglas Kellner**: I mean I'm just talking about format here, that's all.

**Peter Kosinski**: I think it's more than format commissioner, actually. I think it does rise to a different level when it achieves formal opinion status. To me guidance is less, a lesser standard than a formal opinion, so.

**Douglas Kellner**: That's why I raise it.

**Peter Kosinski**: No I think that's a good point.

**Kim Galvin**: If I may interject, the commissioners could adopt this as a guidance statement such as we did the aggregate limit. Then they would both be in the same format and we can reference that when we convert them in to be formal opinion status?

**Bill McCann**: Yes.

**Peter Kosinski**: Okay. I'm okay with that.

**Brian Quail**: Sounds good.

**Kim Galvin**: Thank you.

**Peter Kosinski**: Besides the format are there any other questions about the subject matter text of the document in front of us? Or anything else you want to say Bill, as far as explaining this? Okay.

**Bill McCann**: I mean the staff did work on this language and came to a consensus on it.

**Douglas Kellner**: And we did consult with the attorney general?

**Douglas Kellner**:  And the attorney general has not raised any objection?

**Brian Quail**:  In particular the solicitor general's office, obviously they're in charge of defending state statutes, and they were consulted initially in making the determination not to take an appeal to this case, and when they reviewed this, indicated that this was consistent with their view of the operative law.

**Peter Kosinski**:  Okay.  Then I would entertain a motion to adopt this guidance.

**Andy Spano**:  So.

**Peter Kosinski**:  A motion, second?

**Greg Peterson**:  Second.

**Peter Kosinski**:  All in favor?

**Multiple**:  Aye.

**Peter Kosinski**:  Opposed?  And I guess we do that and also direct the staff to create a formal opinion that we'll adopt this plus the other guidance documents related to this.  Okay.  Let's see that is the end of the public meeting agenda.

**Tom Connolly**:  Do we have a final date on the next meeting?

**Peter Kosinski**:  I'm sorry yes, June 30.

**Tom Connolly**:  30?

**Peter Kosinski**:  June 30 will be our next meeting.  So is there any other business to come before the board before we would entertain a motion to go into executive session?

**Douglas Kellner**:  And the executive session is for personnel?

**Peter Kosinski**:  That's my understanding, personnel.

**Douglas Kellner**: There's no enforcement that is.

**Risa Sugarman**: No.

**Douglas Kellner**: Okay.

**Peter Kosinski**: I'll entertain a motion to go into executive session for personnel.

**Douglas Kellner**: So move.

**Peter Kosinski**: Second?

**Greg Peterson**: Second.

**Peter Kosinski**: All in favor?

**Multiple**: Aye.

**Peter Kosinski**: Opposed?  And the meeting, public session meeting is adjourned we do not expect to come back into public session today.

**Andy Spano**: Thank you.

Peter S. Kosinski
Co-Chair

Gregory P. Peterson
Commissioner

Todd D. Valentine
Co-Executive Director

Kimberly A. Galvin
Co-Counsel



**NEW YORK STATE** | **Board of Elections**

Douglas A. Kellner
Co-Chair

Andrew J. Spano
Commissioner

Robert A. Brehm,
Co-Executive Director

Brian L. Quail
Co-Counsel

## STATE BOARD OF ELECTIONS
**40 NORTH PEARL STREET, 5th FLOOR**
**ALBANY, N.Y. 12207-2729**
**Phone: 518/474-1953   Fax: 518/474-1008**
www.elections.ny.gov

August 4, 2016

STATE OF NEW YORK            )
STATE BOARD OF ELECTIONS   )  ss:

It is hereby CERTIFIED that the attached documents are true and exact copies of the original documents on file with the New York State Board of Elections, to wit:

1) Transcript of the May 4, 2016, New York State Board of Elections Commissioners Meeting.

**WITNESS** my hand and the official seal of the State Board of Elections at the City of Albany, this ⎍th day of August, Two Thousand Sixteen.

William J. McCann, Jr.
Deputy Counsel